550 So.2d 219 (1989)
STATE of Louisiana
v.
Philip RUBBICCO.
No. 88-KA-0969.
Court of Appeal of Louisiana, Fourth Circuit.
September 14, 1989.
Writ Denied January 19, 1990.
*220 Harry F. Connick, Dist. Atty., Sandra Pettle, Asst. Dist. Atty., of Orleans Parish, New Orleans, for appellee.
Ralph S. Whalen, Jr., Oestreicher, Whalen & Hackett, New Orleans, for appellant.
Before SCHOTT, C.J., and WILLIAMS and PLOTKIN, JJ.
WILLIAMS, Judge.
Appellant, Philip Rubbicco, was indicted by a grand jury on June 12, 1986, which charged him with two counts of sports bribery in violation of LSA-R.S. 14:118.1[1] *221 for the alleged bribing of fellow jockeys Gerard Melancon (count one) and Jeff Faul (count two), and one count of conspiracy to commit sports bribery in violation of LSA-R.S. 14:26 and 14:118.1 (count three). In the same bill of information, Alonzo Guajardo was charged with one count of conspiracy to commit sports bribery in violation of LSA-R.S. 14:26 and 14:118.1. Both defendants pled not guilty at their arraignment and after a two-day trial, held February 10-12, 1987, Guajardo was acquitted while the six person jury found Rubbicco guilty as charged on counts one and three and not guilty on count two. Rubbicco was then sentenced on August 28, 1987 to serve two years at hard labor on count one, sentence suspended, and placed on active probation for one year. Additionally, he was sentenced to pay a fine of $10,000.00 or, in lieu of the fine, serve two years at hard labor. On count three Rubbicco was also sentenced to serve two years at hard labor concurrently with the sentence imposed for count one, sentence suspended, and placed on active probation for one year.
On appeal, Rubbicco asserts that the trial court erred 1) by failing to grant a mistrial, claiming the prosecutor's rebuttal argument went beyond the scope allowed by LSA-C.Cr.P. art. 774; 2) in denying defendant's motion for new trial, as the prosecutor interrupted defense counsel's cross-examination of a witness to inquire where defense counsel purchases his own cocaine; 3) in allowing testimony by Melancon, which defendant claims is highly prejudicial and irrelevant hearsay; 4) in allowing allegedly irrelevant testimony of a police officer that called for his opinion, a witness not qualified as an expert; 5) by denying defendant's motion for severance as Guajardo's defense could have been antagonistic to Rubbicco's defense; 6) by denying defendant's motion for individual voir dire and for a new jury panel; and 7) in denying defendant's motion to produce grand jury transcripts. After reviewing the record and jurisprudence, however, we find Rubbicco's claims are without merit. Accordingly, Rubbicco's conviction and sentences are affirmed.
FACTS
Rubbicco was convicted of having fixed the 11th race at the Fairgrounds Race Track on March 19, 1986. The race was a trifecta[2] and the computer records of the March 19, 1986 betting transactions reflect that five unusually large bets were placed, two by one individual at the "large bet window" for $600.00 (paid $3,327.50) and another for $3,000.00 (paid $16,637.50) and bets at a second window for $1,200.00 (paid $2,840.00) and two for $1,800.00 (paid $9,982.50 each). The bets were all "trifecta boxes" naming horses numbered 1, 3, 5 and 7.[3] These five bets paid a total of $42,770.00, which was sixty percent of the trifecta pool.
Jockeys, Gerard Melancon and Jeff Faul, testified at trial that Rubbicco approached them separately between the 10th and 11th races and requested that they pull their horses so they would not place first, second or third in the 11th race. Faul was riding a favored horse, while Melancon's horse was not favored to win. During the race Melancon's horse brushed or bumped Faul's horse and neither horse finished first, second or third. In exchange for their assistance, Rubbicco gave Melancon $500.00 before the race. After the race, Faul found $800.00 in his box in the jockey room.
Subsequently, Faul admitted to his horse's trainer, Mr. Romero, that the 11th race had been fixed. Romero consulted with the racing commission and acting upon their advise, contacted the State Police. When he spoke to Romero, the police and the district attorney's office, Faul initially denied his part in fixing the race and *222 accepting the bribe. Likewise, Melancon also denied knowledge of the race fixing. But after both men were guaranteed immunity from prosecution as per LSA-R.S. 14:118.1(B),[4] they waived their Fifth Amendment rights and gave statements that incriminated themselves and Rubbicco.
Rubbicco was then indicted for two counts of sports bribery and one count of conspiracy to commit bribery. And on February 12, 1987, after a two-day trial, the six person jury found Rubbicco guilty as charged on counts one and three, relating to sports bribery and conspiracy to commit sports bribery[5]. He was found not guilty of sports bribery on count two. The defense made an oral motion for new trial on December 12, 1987 and then filed a written motion, which was denied. Rubbicco was sentenced on August 28, 1987 and he filed a motion for appeal on September 3, 1987.
ERRORS PATENT REVIEW
A review of the record reveals no errors patent.
ASSIGNED ERRORS
Argument No. 1
By his first assignment of error, Rubbicco contends that the trial court erred by denying his motion for mistrial in which he argued that the remarks made by the prosecutor during the rebuttal of closing argument exceeded the scope of LSA-C.Cr.P. art. 774 and/or were so prejudicial that he was denied a fair trial.
During his closing arguments, Rubbicco's counsel attempted to mitigate the strength of the testimony of the two State witnesses, Faul and Melancon, by emphasizing that these witnesses had also committed sports bribery, but had been given immunity by the State. The implication being that because the witnesses had "cut a deal" with the State, their testimony lacked credibility. Rubbicco's counsel also twice referred to the Hot Rod Williams case, asserting that therein, the jury had refused to convict the defendant on the testimony of the State's witnesses who were cocaine users and who were given immunity in exchange for their testimony against the defendant. The implication being that Rubbicco's jury, like the Hot Rod Williams jury, should find Rubbicco not guilty because the witnesses were alleged criminals who testified in exchange for immunity.
In rebuttal, by referring to a thirteen year old murder case, the prosecutor implied that defense counsel should not criticize the practice of granting immunity in exchange for testimony because defense counsel, himself, had engaged in the practice when he had been the prosecutor of that case. The portion of rebuttal argument of which Rubbicco complains being:
BY (PROSECUTOR) MR. DEEGAN:
It's absolutely true. They cannot be prosecuted if we don't have the evidence. The evidence is in their body. There's no evidence. No corpus delicti. Nothing. Nothing to enter, you can't be prosecuted for that. He mentioned Hot Rod Williams where immunity was given. Well let me tell you bout another case, where a deal was cut. It happened many years ago. It was a murder case. A murder case. Where a man conspired with another man to have his wife killed.
BY (DEFENSE COUNSEL) MR. WHALEN:
Your Honor, I apologize for objecting. They start talking about a murder case years ago. It is clear where Mr. Deegan is going and I think the court knows full well it's objection.
BY THE COURT:
*223 I'll have to overrule the objection. It's in rebuttal.
BY MR. WHALEN:
Note an objection for the record.
BY THE COURT:
Your objection is noted.
BY MR. DEEGAN:
It was in this very courtroom, before this Judge, and guess who the D.A. was? And do you know what D.A. did, Mr. Whalen, he gave a deal, a deal, to the man that killed that woman. A deal to a murder. And he's got the gall ...
BY MR. BONIN:
Your Honor on behalf of the defendant Alonzo Guajardo, I Move for a mistrial.
BY MR. WHALEN:
And I ask for the jury to be instructed that on that deal that man got 21 years in the penitentiary.
BY THE COURT:
Alright gentlemen. I overrule both of your objections.
BY MR. BONIN:
Note an objection your Honor.
BY THE COURT:
Objection noted.
BY MR. DEEGAN:
And that man he gave a deal to is free today. Free today. He did 21 years and is free today. I made a deal ...
BY MR. WHALEN:
I'm sorry your Honor, I move for a mistrial. This is outrageous and it's an intentional attempt to get a mistrial.
BY THE COURT:
Your mistrial is denied Mr. Whalen.
BY MR. WHALEN:
Thank you, and note my objection.
BY THE COURT:
Your objection is noted.
(Tr. transcript pp. 495-496.)
LSA-C.Cr.P. art. 774 sets forth the permissible scope of closing argument:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
Sanctions for arguments that go beyond the scope of this article fall within the ambit of LSA-C.Cr.P. arts. 770 and 771, pertaining to mistrials and admonitions, See LSA-C.Cr.P. art. 774, Comment c; State v. Morris, 404 So.2d 1186, 1191 (La. 1981), with article 770 listing the grounds for granting a mistrial:
Art. 770. Prejudicial remarks; basis of mistrial
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark of comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial. (emphasis added)
The trial court's decision to deny a mistrial will not be disturbed unless it was an abuse of discretion. State v. Harper, 430 So.2d 627 (La.1983). Thus, even if a prosecutor's comments goes beyond the permissible scope of rebuttal argument, mistrial is not warranted under Article 770 unless the remark is of the type listed in the Article and the reviewing court is thoroughly convinced that the jury was influenced *224 by the remarks and that they contributed to the verdict. See State v. Morris, 404 So.2d at 1191.
In the instant case, the prosecutor's remarks were intended to rebut the effect of Rubbicco's closing argument that Faul and Melancon's testimony should be disregarded because the State had granted them immunity to testify. Therefore, the remarks are arguably within the scope of LSA-C.Cr.P. art. 774. Nevertheless, even if mentioning the murder case was improper, the remarks did not fall within the specific grounds for a mistrial under LSA-C.Cr.P. art. 770. Nor did the comments amount to prejudicial conduct that would make it impossible for the defendant to obtain a fair trial, mandating a mistrial under LSA-C.Cr.P. art. 775. And in this case, because the evidence of Rubbicco's guilt was so overwhelming that when the remarks are considered in context, we find the jury could not have been influenced by the remarks and could not have contributed it to their verdict.
Therefore, this assignment is without merit.
Argument No. 2
By this assignment of error Rubbicco asserts that the trial court erred by not granting his motion for new trial which is based upon an inflamatory remark made during the cross-examination of a State's witness. The remark was made by the prosecutor and directed towards defense counsel.
The remark Rubbicco and his counsel find objectionable is contained in the following excerpt:
BY MR. WHALEN (defense counsel):
Q. Do you know a fellow by the name of Joseph P. Dorignac, III?
BY GERARD MELANCON (State's witness)
A. Yes sir.
Q. Do you know he was arrested on drugs charges?
A. Yes sir.
Q. You don't buy drugs from him?
BY MR. DEEGAN:
Objection your Honor.
A. No sir.
BY THE COURT:
Sustained.
Q. Do you know whether or not there's any video tape of you going into his house taken by the State Police?
A. Yes sir.
Q. There is?
A. Yes sir. Not into the Dorignac's house sir.
Q. Who's house?
BY MR. DEEGAN:
Your Honor I am going to object to any further questions on Mr. Dorignac's problems with the State Police, it has nothing to do with this case or Mr. Melancon.
BY THE COURT:
Well if it is relevant Mr. Whalen I am going to allow it, but you have not established a relevancy here.
BY MR. WHALEN:
Q. Who's house is there a film of you going into?
BY THE COURT:
No, no. The time, the time set Mr. Whalen.
BY MR. WHALEN:
Q. The house that there's film of you going into, is that the house of a drug dealer?
A. Yes sir.
BY THE COURT:
Sustained. You have to establish a relevancy with regard to this case and on the witness's credibility in this case.
BY MR. DEEGAN:
Your Honor, I object to Mr. Whalen's continuing character assassination when there is no ...
BY THE COURT:
I sustained your objection counsel.
BY MR. WHALEN:
Your Honor, I am attempting to show what the witness is getting in return for his testimony. I can demonstrate he was in the home of a drug dealer ...
BY THE COURT:
*225 Wait, wait, approach the bench.
(A brief consultation was held at the bench).
BY MR. WHALEN:
Q. Mr. Melancon when was this film taken, roughly, of you going into this particular house?
A. I don't know sir.
Q. About when?
A. Last three or four months.
Q. Within the last three or four months?
A. Since Thanksgiving.
Q. The district attorney's office is aware of that film as far as you know?
A. Yes sir.
Q. Now was that the house of a drug dealer?
A. That's the house they busted the drug dealers, yes sir.
Q. Anybody indicated to you that you are going to be prosecuted for drug use because of that case where you are on video tape?
BY MR. DEEGAN:
Objection your Honor, on video tape of what, walking into somebody's house? How can somebody be prosecuted for that Mr. Whalen ...
BY MR. WHALEN:
Your Honor, if he would like to take the stand and testify.
(Everyone speaking at once).
BY THE COURT:
Gentlemen, gentlemen.
BY MR. DEEGAN:
I would be glad to take the witness stand Mr. Whalen.
BY THE COURT:
Both of you are going to end up taking the jail stand. Do we understand each other gentlemen?
BY MR. DEEGAN:
Yes I do your Honor.
BY THE COURT:
Mr. Whalen?
BY MR. WHALEN:
Yes sir, your Honor.
BY THE COURT:
The objection is overruled Mr. Deegan.
BY MR. WHALEN:
Q. Has anyone from the district attorney's office told you that you can expect to be prosecuted for going into the house of a drug dealer where there is a video tape of you going into that house?
A. How can they prosecute me if they hadn't seen what I did? You can go in anybody's house.
Q. Did you tell them whether or not you bought drugs in that house?
A. No of course, no sir.
Q. Did you say "No, of course"?
A. Of course not.
Q. Are they aware of your drug use? Have you told them that you use cocaine?
A. Yes sir.
Q. Did you buy drugs in that house?
A. I don't have to answer that, I don't think so.
Q. I am sorry?
A. I don't think I need to answer that. No sir, I didn't.
Q. Has anybody from the district attorney's office asked you where you get your cocaine?
A. No sir.
BY MR. DEEGAN:
Your Honor, what isI don't understand the relevancy of this case. Mr. Whalen, where do youdo you buy cocaine Mr. Whalen?
BY THE COURT:
Mr. Deegan ...
(Brief laughter among jurors)
BY THE COURT:
Mr. Deegan, come here. Address yourself to me. Not to Mr. Whalen. Gentlemen, any more going back and forth between the attorney's, I am going to put somebody some place I don't want to put them. Necessarily.
BY MR. DEEGAN:
My apology to the Court.
BY THE COURT:
Objection is overruled. We are speaking about a time period of Mr. Whalen, I think some weeks ago.
The State's objection is overruled.
BY MR. WHALEN:
*226 I've forgotten the question.
BY THE COURT REPORTER:
Has anybody from the D.A.'s office asked you where you get your cocaine?
BY THE WITNESS:
Sir?
BY THE COURT:
Repeat the question Mr. Whalen.
BY MR. WHALEN:
Q. Did you understand the question?
A. No sir.
Q. Has anybody from the district attorney's office asked you where you get your cocaine?
A. No sir.
Q. Has anybody from the district attorney's office expressed an interest at all in your use of cocaine, or finding out who your sources are, or pursuing this at all?
BY MR. DEEGAN:
Objection your Honor.
BY THE COURT:
Sustained.
BY MR. WHALEN:
Q. If I understand you correctly, Mr. Melancon, you are an admitted cocaine user and the district attorney's office proposes to do nothing about it, is that your understanding?
BY MR. DEEGAN:
Objection your Honor.
BY THE COURT:
Sustained.
BY MR. WHALEN:
Q. If I understand you you have admitted cocaine use to the district attorney's office, and no one has indicated to you that you need to expect any prosecution, is that right?
A. Right.
BY MR. DEEGAN:
Your Honor, I also object to that form of question, Mr. Whalen knows we can't prosecute ...
BY THE COURT:
Objection is overruled.
BY MR. DEEGAN:
There's no legal basis.
BY THE COURT:
The objection is overruled. Watch my lips Mr. Deegan.
(Brief laughter).
BY MR. WHALEN:
Q. Have you admitted cocaine use to Mr. Deegan?
A. Yes.
(tr. transcript pp. 456-461; (emphasis added))
As the excerpt indicates the remark about where defense counsel purchases his cocaine was followed by the judge's reprimanding both the prosecutor and defense counsel for the outragousness of their behavior. Afterwards, the prosecutor apologized to the court. Defense counsel, however, took no action such as a contemporaneous objection, a motion for mistrial, or a request that the jury be admonished. Rather, the objection to the prosecutor's remark was raised for the first time post-trial, in defendant's motion for new trial.
LSA-C.Cr.P. Article 841 provides in pertinent part that "... [a]n irregularity or error cannot be availed of after the verdict unless it was objected to at the time of the occurrence." (emphasis added) This contemporaneous objection rule has two purposes: 1) to put the trial judge on notice of the alleged irregularity so that he may cure the problem, and 2) to prevent a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by objection. State v. Thomas, 427 So.2d 428 (La. 1982); State v. Capano, 466 So.2d 649 (La. App. 5th Cir.1985).
Rubbicco, nonetheless, claims that the outrageousness of the State's remark caused defense counsel a lapse of sorts so that the error or defect in the proceedings caused by remark went undiscovered until after the verdict, despite the exercise of reasonable diligence, citing LSA-C.Cr.P. art. 851(4). Our review of the incident, however, reveals that both the attorneys and the court were aware of the remark and the affect it had upon the jury (it caused laughter). Article 851(4) is inapplicable; to apply it to this case would render Article 841 useless because it would allow defense counsel to circumvent the contemporaneous *227 objection rule by claiming he was "stunned" by a prosecutor's remark.
Moreover, we find that while the court did not admonish the jury to disregard the remark as per LSA-C.Cr.P. art. 771, the court did reprimand the prosecutor so that the jury was aware of the impropriety of the State's rhetorical question. In the context of the quibbling between counsel, the comment apparently had no greater effect than to dismay the jury because of the manner in which the prosecutor lapsed into such unprofessional conduct. Consequently, even though we find the prosecutor's remark inexcusable, because it did not substantially effect the reliability of the fact finding process, it does not create an occasion for failing to apply the contemporaneous objection rule.
Therefore, this assignment lacks merit.
Argument No. 3
By his next assignment Rubbicco contends that the trial court erred in allowing into evidence portions of Melancon's testimony wherein he claimed that he did not return the money paid to him by Rubbicco because he was afraid.
The record reflects that Melancon's fears were based upon his actual knowledge and information he had heard over the years about jockeys being injured or killed because of their involvement in race fixing. At trial, Rubbicco's counsel objected to the testimony on the basis of relevancy, but on appeal he claims the testimony should have been disallowed because it is highly prejudicial and irrelevant hearsay. However, because Rubbicco cannot raise a new basis for his objection for the first time on appeal, LSA-C.Cr.P. art. 841; State v. West, 419 So.2d 868 (La.1982), only the objection on the grounds of relevancy can be reviewed.
The testimony complained of is as follows:
BY MR. DEEGAN: Q. AFter (sic) the race was over where did you go?
BY MR. MELANCON: A. I went to Jeffery's house?
Q. Did you go back to the jock's room?
A. Yes sir.
Q. You changed?
A. Yes sir.
Q. Did you go home with anybody that day?
A. Yes sir.
Q. Who did you go home with?
A. Jeff Faul.
Q. Did you all talk about that race?
A. Yes sir.
Q. How did you feel then?
A. Felt real scared.
Q. Did you want to talk about the money?
A. Yes sir.
Q. Do you know how much money Jeffery Faul got?
A. Yes sir.
A. Eight hundred dollars.
Q. Did you all talk about what you were going to do with the money?
A. Yes sir.
Q. What did you all talk about?
A. We talked about giving the money back. Because he and I was scared.
Q. Did you give the money back?
A. No sir.
Q. Why not?
A. Because we was scared sir.
Q. What were you scared of?
BY MR. WHALEN: Objection to the relevancy your Honor.
BY THE COURT: Overruled.
BY MR. DEEGAN:
Q. What were you scared of Mr. Melancon?
A. Well over the passed years you hear jockeys getting shot ...
BY MR. WHALEN:
Objection your Honor, this is obviously is going to call for stuff that irrelevant and has nothing [sic] do with this trial. May we approach the bench.
BY THE COURT:
Yes sir.
(A brief consultation was held at the bench.)
BY THE COURT:
I will overrule the objection and I will allow the exceptions to be reserved.
BY MR. DEEGAN:
*228 Q. You can answer that question Gerard. What were you scared of?
A. Over the passed few years i [sic] heard of jockeys getting killed, and I heard beat up.
Q. You know any of those jockeys?
A. Yes sir.
Q. Have you ever been asked to fix a race before?
A. No sir.
Q. Were you ashamed of what you had done?
A. Yes sir.
Q. So you never gave the money back?
A. No sir.
(tr. transcript, pp. 437-439)
Assuming this portion of Melancon's testimony was admitted in error, it does not constitute grounds for reversible error under LSA-C.Cr.P. art. 921 because in light of the strength of the evidence against Rubbicco, it would be unreasonable to conclude that Melancon's reasons for not returning the bribe contributed to the jury's verdict. Consequently, as Rubbicco cannot demonstrate the prejudicial effect of the testimony, if the trial court erred in allowing the testimony, the testimony fell under the harmless error rule of LSA-C.Cr.P. art. 921.[6]
This claim, therefore, lacks merit.
Argument No. 4
By this assignment Rubbicco contends that the trial court erred in allowing into evidence portions of the testimony of the officer in charge of the investigation because it reflected an opinion and he was a witness not qualified as an expert and because it was irrelevant.
The State's witness, Trooper Kavanaugh who was the officer in charge of the race-fixing investigation, testified over defense objection that he had conducted other investigations concerning illegalities at the race track; that during these investigations, he interviewed people involved in the racing industry; and that based upon his experience in interviewing these individuals, he found they were not very cooperative. Rubbicco contends that Trooper Kavanaugh's statement about the witnesses he interviewed being uncooperative is a statement of opinion, and since Trooper Kavanaugh was not qualified as an expert, the trial court erred in allowing his opinion into evidence. Rubbicco also contends that the trial court erred in allowing the introduction of this testimony because it is irrelevant.
Generally, a non-expert witness can testify "only as to facts within his knowledge, and neither as to any recital of facts heard by him, nor as to any impression or opinion that he may have." LSA-R.S. 15:463. The courts' application of this rule, however, recognizes that it states a guiding principle, containing several variables. State v. Kahey, 436 So.2d 475, 490 (La.1983). In State v. Kahey, the Supreme Court stated that the terms "fact" and "opinion" denote merely a difference of degree of concreteness of description or a difference in nearness or remoteness of interest. 436 So.2d at 490-491. The opinion rule, then, operates merely to prefer the more concrete description to the less concrete, the direct form of statement to the inferential. 436 So.2d at 491, citing State v. Wheeler, 416 So.2d 78 (La.1982). Consequently, certain testimony which might be termed "opinion" is allowed when it is clear from the circumstances that the witness drew a reasonable inference from his personal observations. 436 So.2d at 491. However, in deciding whether to admit the "opinion" testimony, the Kahey Court directed that one factor the trial court should consider is whether the testimony relates only to a collateral matter or to the ultimate issue of the case. 436 So.2d at 491.
Applying the guidelines of Kahey to the facts herein, we find the trial court did not err by overruling the objection that Trooper Kavanaugh's testimony was impermissable opinion testimony. Trooper Kavanaugh interviewed individuals at race tracks and testified that he found them *229 uncooperative based upon his observations while interviewing them. Such statements are reasonable inferences drawn from the witness's personal observations. Moreover, since the statements do not relate to the ultimate issue of whether Rubbicco conspired to and/or committed sports bribery, the statements are collateral issue testimony that could not have prejudiced the jury's verdict.
The determination of the relevancy of this testimony, however, is not as clear-cut. "Relevant" evidence is that tending to show or to negate commission of the offense and the intent to commit the offense. LSA-R.S. 15:441. To be admissable, evidence must be relevant to a material issue of the case, i.e. make a consequential fact more or less probable. State v. Reid, 539 So.2d 876 (La.App. 4th Cir.1989); State v. Williams, 513 So.2d 356 (La.App. 4th Cir. 1987). The trial judge has much discretion in determining the relevancy of evidence and his determinations will not be disturbed absent a clear abuse of discretion. State v. Caldwell, 504 So.2d 853 (La.1987); State v. Reid, 539 So.2d at 877.
The correctness of the trial court's determination, that Trooper Kavanaugh's testimony about his prior investigations and his conclusions regarding the cooperativeness of racing personnel in prior investigations is relevant, is questionable but does not amount to a clear abuse of discretion. Moreover, even if the testimony is irrevelant, admission of the testimony is harmless error. Due to the strength of the evidence against Rubbicco testimony on the cooperativeness of race track personnel could not have contributed to the jury's guilty verdict. Thus, even if the testimony is irrevelant, its admittance falls under the harmless error rule of LSA-C.Cr.P. art. 921.
This assignment of error lacks merit.
Argument No. 5
By this assignment Rubbicco contends that the trial court erred in denying the motion to sever the trial of the claims against Guajardo from those against himself.[7] Rubbicco argues that severance was required because counsel for Guajardo asserted at the hearing on the motion that his defense was antagonistic to Rubbicco. However, Rubbicco does not cite any portion of the trial record showing where Guajardo's defense was antagonistic in fact.
Motions to Sever are governed by LSA-C.Cr.P. art. 704 which provides:
Art. 704 Severance
Jointly indicted defendants shall be tried jointly unless:
(1) the state elects to try them separately; or
(2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
Subsection 2 of Article 704 refers to situations where co-defendants have "antagonistic defenses" and permits a judge to grant a severance, when in his opinion and after a contradictory hearing, justice requires it. LSA-C.Cr.P. art. 704, Comment D. But mere allegations of antagonistic defenses are insufficient to warrant a severance under LSA-C.Cr.P. art. 704. State v. Barkley, 412 So.2d 1380 (La.1982). Defendant bears the burden of satisfying the trial court that justice requires a severance, State v. Williams, 416 So.2d 914 (La. 1982), and the trial court is given much discretion to determine whether to grant a severance; its decision will not be reversed on appeal absent a clear showing of cause. State v. Prudholm, 446 So.2d 729 (La. 1984).
In the present case, during a recess in the contradictory hearing Guajardo's counsel met with the trial judge in chambers and divulged to the court the evidence he planned to present at trial that would allegedly be antagonistic to Rubbicco. Based upon this in chambers review, the trial court concluded that Guajardo's defense was not antagonistic to Rubbicco and, therefore, denied severance. At trial, no *230 evidence was offered in Guajardo's defense that inculpated Rubbicco or that implicated Rubbicco and Faul instead of Rubbicco and Guajardo.
Rubbicco, on appeal, has not cited a single instance of where Guajardo's defense was antagonistic to his own. Consequently, his general allegations are insufficient to show severance was warranted and he has not shown that the trial court abused its discretion in denying the severance.
This assignment lacks merit.
Argument No. 6
By this assignment Rubbicco contends that the trial court erred in denying his motion for a form of individual voir dire and for a new jury panel after one venire person allegedly contaminated an entire panel.
Prior to the commencement of voir dire, Rubbicco moved that the general voir dire questions be addressed to the panel as a whole, but that individual questioning be conducted with panels of only six veniremen to insulate the prospective jurors from possible prejudicial remarks and responses of other prospective jurors under examination. Rubbicco claimed this form of individual voir dire was necessary because the publicity his case had received made it probable that members of the jury pool might have already heard of the case and concluded that the horse race had in fact been fixed. Rubbicco asserted that if this procedure was instituted, if a venireman made a prejudicial comment, it would not be heard by the entire jury pool and the entire pool would not become contaminated.
Although the trial court denied the motion, voir dire was conducted with panels of twelve prospective jurors at a time. During the voir dire of the first panel of prospective jurors, one prospective juror, Ms. Davis, made a comment which Rubbicco contends tainted the entire first panel of twelve. The remark occurred after Ms. Davis stated that she had been to the race track with her family and she was asked if she had "... formed any opinion as to the honesty or dishonesty of people in horse racing". To which she replied, "I think first of all, my personal opinion, a for (sic) all matters concerned, I always figure there is something behind all this."
Following this remark, Rubbicco's counsel made no contemporaneous objection. Instead, he waited until the State had finished questioning and tendering the entire panel of twelve before moving to dismiss the panel. At that time, defense counsel alleged that Ms. Davis' statement that "she thinks in effect races are fixed at the Fairgrounds" contaminated the entire panel. And he also requested that the trial court adopt the six person panel procedure previously requested. This motion for individual voir dire, however, was summarily denied and three of these veniremen were eventually selected to sit on Rubbicco's six person jury.
In our law there is no provision which either prohibits or requires the selection of prospective jurors for an individual voir dire. State v. Comeaux, 514 So.2d 84, 88 (La.1987); State v. Copeland, 530 So.2d 526, 535 (La.1988). Consequently the manner in which the veniremen are called and the scope of the examination are left to the court's discretion. LSA-C.Cr.P. art. 784, and comment (c); State v. Comeaux, 514 So.2d at 88. In its discretion, a trial court permits individual voir dire when a defendant demonstrates the existence of special circumstances. State v. Comeaux, 514 So.2d at 88; State v. Lindsey, 404 So.2d 466 (La.1981). Absent special circumstances, however, it is not error for the trial court to refuse requests for individual voir dire and the defendant bears the burden of showing that the trial court abused its discretion in refusing to sequester the venire at voir dire. State v. Comeaux, 514 So.2d at 88.
Rubbicco did not meet his burden of showing special circumstances justifying his requested form of individual voir dire. Therefore, the trial court did not err in denying his motion(s) for individual voir dire. Additionally, serious doubt exists as to whether Ms. Davis' remark can be considered prejudicial, as she commented on horse racing in general without reference *231 to the defendants' guilt. Moreover, the veniremen questioned after Ms. Davis did not appear contaminated by her remark and they even responded that they would not convict the defendants unless the State proved their guilt beyond a reasonable doubt. Therefore, we find no error in either the trial court's refusal to dismiss the entire panel of twelve following Ms. Davis' remark, Cf. State v. Jordan, 420 So.2d 420 (La.1982); State v. Copeland, 530 So.2d 526 (La.1988), or the trial court's denial of individual voir dire.
This assignment lacks merit.
Argument No. 7
By his final assignment Rubbicco claims the trial court erred in refusing to turn over the tapes of and/or transcripts of the colloquy between the prosecutor(s) and the grand jurors that indicted him.[8] He does not allege specific grounds for the review, but only requests that this court review the tapes and/or transcripts to determine whether the trial court properly ruled upon his motion for production.
Rubbicco moved pretrial for production and inspection of the colloquy between the prosecutor(s) and the grand jury that indicted him. Defense counsel's accompanying affidavit claimed that the State had made remarks prejudicial to defendant before the grand jury. After a pretrial hearing, the trial court ordered the state to produce transcripts of the grand jury proceeding so that the court might inspect the transcript, in camera and determine if the transcripts evidenced prosecutorial misconduct as defendant claimed. Thereafter, at a hearing held on August 13, 1986, the trial court stated that it had reviewed the grand jury transcripts but found no evidence of prosecutorial misconduct.
It is a long established policy that the secrecy of grand jury proceedings should be carefully maintained. State v. Trosclair, 443 So.2d 1098, 1102 (La.1983), cert. dis., 468 U.S. 1205, 104 S.Ct. 3593, 82 L.Ed.2d 889 (1984). Consequently, the indispensable secrecy of grand jury proceedings is not broken unless there is a compelling necessity. Thus, LSA-C.Cr.P. art. 434 generally prohibits members of the grand jury and others present from divulging the testimony and other matters occurring during meetings but permits disclosure of grand jury materials in several situations: First, after indictment, members of the grand jury and other persons present may reveal statutory irregularities in grand jury proceedings to defense counsel, the attorney general, the district attorney or the court; second, a court may direct disclosure of testimony given before the grand jury to show that a witness committed perjury in his testimony before the grand jury; third, attorneys for the state and for a person under investigation or indicted, are permitted access to witnesses for the purpose of discussing their testimony before the grand jury without court permission. 443 So.2d at 1102-1103.
There may also be instances in which a defendant's need for grand jury materials outweighs this need for continued secrecy. But in those instances, the defendant must allege his need for the transcripts with particularity. He must prove that without access to the grand jury materials his case would be greatly prejudiced or that an injustice would be done. 443 So.2d at 1103. Then, if disclosure is permitted, disclosure will be closely confined to the limited portion for which there is a particularized need. 443 So.2d at 1103.
Herein, Rubbicco supported his request for the grand jury transcripts with only generalized claims. He claimed that the State may have made prejudicial remarks to the grand jury and may have been present during grand jury deliberations. No facts, however, were asserted in support of these claims. Consequently, due to Rubbicco's failure to allege any specific facts showing he would be greatly prejudiced or that injustice would be done, we cannot say that the trial court abused its much discretion in finding he failed to prove a particularized need of disclosure *232 which outweighed the need for continued secrecy. Compare State v. Trosclair, supra.
Therefore, this assignment lacks merit.
Accordingly, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] LSA-R.S. 14:118.1 provides in pertinent part:

A. Bribing of sports participants is the giving or offering to give, directly or indirectly, anything of apparent present or prospective value to any professional or amateur baseball, football, hockey, polo, tennis or basketball player or baxer or any person or player who participates or expects to participate in any professional or amateur game or sport or any contest of skill, speed, strength or endurance of man or beast or any jockey, driver, groom or any person participating or expecting to participate in any horse race, including owners of race tracks and their employees, stewards, trainers, judges, starters or special policemen, or to any owner, manager, coach or trainer of any team or participant in any such game, contest or sport, with the intent to influence him to lose or cause to be lost, or corruptly to affect or influence the result thereof, or to limit his or his team's or his mount or beast's margin of victory in any baseball, football, hockey or basketball game, boxing, tennis or polo match or horse race or any professional or amateur sport or game in which such player or participant or jockey or driver is taking part or expects to take part, or has any duty in connection therewith.
The acceptance of, or the offer to accept directly or indirectly anything of apparent present or prospective value under such circumstances by any of the above named persons shall also constitute bribery of sports participants.
Whoever commits the crime of bribery of sports participants is guilty of a felony and shall be punished by a fine of not more than ten thousand dollars and imprisoned for not less than one year nor more than five years, with or without hard labor, or both.
[2] The bettor wins if any three of the four named horses are the top three horses in the race.
[3] Horses one and three were not favored. Therefore, because of the long odds, the payoff potential was a total greater than on the favored horses.
[4] LSA-R.S. 14:118.1(B) provides:

The offender under this Section, who states the facts under oath to the district attorney charged with the prosecution of the offense, and who gives evidence tending to convict any other offender under that Section, may, in the discretion of such district attorney be granted full immunity from prosecution in respect to the offense reported, except for perjury in giving such testimony.
[5] Alonzo Guajardo, another jockey and Rubbicco's co-defendant, was implicated in the race fixing. However, as meager evidence was offered to support the contention that Guajardo had conspired with Rubbicco to fix the race, Guajardo was found not guilty.
[6] Rubbicco also complains that the State later used Melancon's statement during closing argument. However, as Rubbicco did not object to its use, he waived his right to claim error on appeal. LSA-C.Cr.P. art. 841.
[7] Initially, Guajardo moved for the severance, but Rubbicco subsequently joined in the motion.
[8] The transcripts of the testimony before the grand jury which indicted defendant(s) is not part of the appellate record.