574 So.2d 486 (1991)
STATE of Louisiana
v.
Carlene FLEMING and Robert Cossich.
No. 88-KA-1968.
Court of Appeal of Louisiana, Fourth Circuit.
January 25, 1991.
*488 Harry F. Connick, Dist. Atty., Richard Olsen, Asst. Dist. Atty., New Orleans, for plaintiff-appellee State of La.
Dwight Doskey, Cherbonnier & Doskey, Harvey, and Clyde Merritt, New Orleans, for defendant-appellant Robert Cossich.
Raleigh L. Ohlmeyer, Jr., New Orleans, for defendant-appellant Carlene Fleming.
Before GARRISON, KLEES and CIACCIO, JJ.
KLEES, Judge.
Carlene Fleming and Robert Cossich were indicted by a grand jury for the first degree murder of George Fleming on November 18, 1986. They were also separately indicted for conspiracy to commit first degree murder. Fleming and Cossich were tried together for first degree murder before a twelve-person jury on January 5-9, 1988. Fleming was found guilty as charged, and the jury recommended a life sentence. Cossich was found guilty of second degree murder. Fleming and Cossich were both sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.
FACTS:
On November 18, 1986, at approximately 9:30 p.m., George Fleming was shot to death in the driveway adjacent to his apartment at 8016 Trapier Street in New Orleans. He was shot five times with a .45 caliber pistol. Fleming lived there with his wife Carlene Smollen Fleming and Christopher Enos, a young man that Fleming had befriended.
Thomas Peck, a neighbor who witnessed the shooting, stated that he only saw a dark silhouette do the shooting. There were no other witnesses to the shooting, although at the time of the shooting, Mrs. Fleming and Enos were inside the apartment. They admitted hearing the shots and Fleming's screams.
The next day, the police officers investigating the murder were informed by another officer, Sal DiVincenti, that his wife's cousin, Patricia Gore (also referred to as "Tricia") had information about the murder. Patricia, who was fifteen years old, dated Mrs. Fleming's younger brother, Bill Smollen.
Patricia informed the police that she met Mrs. Fleming and Enos approximately a week earlier at the Smollen household. Mrs. Fleming stated that Enos was her boyfriend. Mrs. Fleming told her about problems she was having with her husband, including attempts by him to shoot and poison her and his suspected homosexuality and drug use. Mrs. Fleming also told her that her days were numbered and she wanted to get rid of her husband. Patricia testified that Mrs. Fleming asked her if she knew someone who could kill her husband because Mrs. Fleming had been told that Patricia's father was in the Mafia and her brother in the Ku Klux Klan. Patricia *489 admitted disclosing this information to Bill Smollen but that it was a lie.
Patricia told Mrs. Fleming that she might know someone who would be willing to do it and gave her the name of Steedie Ubas, a former boyfriend with whom she was still friends. Mrs. Fleming asked Patricia to get in touch with him. Enos also asked Patricia to help Mrs. Fleming with her problems with her husband. Patricia later called Steedie and told him of Mrs. Fleming's proposition. Steedie had with him two friends, Zane Bryant and Brian D'Antoni (also referred to "Bryant"). Steedie thought Patricia was joking. Later, Mrs. Fleming called and told them of her offer. She would pay one thousand dollars to have her husband killed and would supply the weapon. At some later point, Robert Cossich and Jason Lafrance joined the three other young men, and the details of the murder scheme were settled.
On November 17, 1986, three young men showed up at the home of Mrs. Fleming's parents, and Patricia was there at the time. Patricia testified that the three men were Steedie, Zane and Robert Cossich. Mrs. Fleming's mother testified she could identify only one of them, which was Steedie. Patricia stated she had not previously known Zane or Cossich. She did not know why they were there, and that they spoke with Bill Smollen. Patricia called Mrs. Fleming and told her Steedie was with her. Steedie spoke with Mrs. Fleming and the trio left.
The trio, along with Brian and Jason, went to the Fleming apartment. Zane stated that Cossich sat outside with a shotgun for a time. Enos testified that Cossich came to the door of the apartment wielding a shotgun, and that Cossich said he thought George Fleming would answer the door and that he (Cossich) was going to shoot him then. All five young men later went into the apartment where they met with Mrs. Fleming and Enos. They negotiated payment for the murder of George Fleming, and they were offered money, furniture, clothing and guns. The next day Mrs. Fleming gave them a .45 caliber pistol owned by her husband. She told them she was going to send her husband to the grocery store that night and to shoot him when he returned.
On the evening of November 18, the five young men were riding around in Cossich's mother's car, and they went to visit a relative of Brian's who showed them how to load the gun. They then drove to the Fleming apartment.
In the meantime, Mrs. Fleming picked up her husband from work, and they returned to the apartment. Fleming left to go to the grocery store. The five young men saw Fleming return from the grocery store, and Cossich exited the car carrying the .45 pistol. The four who stayed in the car drove around and heard shots. They were informed that someone had been killed on Trapier Street. They left Cossich behind and returned home.
The day after the murder, Mrs. Fleming and her mother, Shirley Smollen, called Patricia to tell her that Fleming had been shot by a black man and not to worry. Mrs. Fleming and Mrs. Smollen went to the flower shop where Patricia's mother, Darjean Gore, worked and told her they needed to speak with Patricia. Later, Mrs. Fleming and Mrs. Smollen arrived at the Gore household and told Patricia that she would be given the money because Mrs. Fleming believed she was being watched.
Later that night, Patricia told the police all she knew which resulted in the arrests of Mrs. Fleming, Enos, Cossich, Mrs. Smollen, Steedie, Zane, Brian and Jason. Mrs. Smollen subsequently pleaded guilty to accessory after the fact to murder; and Steedie, Zane, Brian and Jason pleaded guilty to conspiracy to commit murder. Enos, originally charged with first degree murder, later pleaded guilty to manslaughter and conspiracy to commit murder.
After his arrest, Enos gave a statement to the police and told them of the scheme to murder Fleming. At the hearing on the motion to suppress his confession, Enos testified the police coerced him into making that statement, and that none of it was true. At trial, Enos testified he lied at the motion to suppress hearing because Mrs. Fleming's parents pressured him to do so.
*490 Mrs. Fleming testified she and her husband did have some problems, and admitted that one night, as she lay in bed, her husband held a gun to her head. As to his poisoning her, she testified one night a glass of wine had a metallic taste, and it caused her to become nauseated. She further testified, however, that she was pregnant at the time and that might have been the reason for her nausea.
Mrs. Fleming testified that a few days before she met Patricia, three young men walked into her apartment without knocking and told her that they had been told by a friend she had a problem and needed help. She thought they were friends of her brother, and she told them to go home which they did. She identified two of the young men as Steedie and Zane and described the third young man as looking like "Harpo Marx", and not like Robert Cossich. On the night before the murder, she received a telephone call; and the caller told her that her husband would have been shot that night but they could not get a clear shot.
Mrs. Fleming testified that in the late morning of the day of the murder, the three young men who had visited her before met her and Enos outside the apartment. They told her they needed to talk to her because their "friend" wanted them to talk to her. She told them she was not interested and told them to leave.
On the evening of the murder, she picked up her husband from work, and they went home. Mr. Fleming went to the grocery store, and she and Enos sat in the living room awaiting his return. Sometime later, she heard a car backfire, which the Fleming's car tended to do, and she told Enos to go help unload the groceries. They heard a shot followed by a scream and then more shots and screams. Enos went out to see what happened, and he found George Fleming lying dead.
On the day after the murder, Mrs. Fleming and her mother looked for Patricia so that she could help calm Bill Smollen who was extremely upset by the murder. They went to the florist shop and spoke with Mrs. Gore and went to the Gore household where they spoke with Patricia about Bill.
Peggy Cossich, the sister of Robert Cossich, testified her brother was home the entire evening before the murder and was home on the day of the murder. However, as to the night of the murder, she did not know if Cossich took their mother's car.
Two days after the murder, police seized a .45 caliber pistol from the sewing room at the Cossich household. Phil Jemison, a friend of George Fleming's, testified that the gun was one he exchanged with Fleming in 1980 for one of Fleming's guns.
Error Patent:
A review of the record reveals no errors patent.
Defendants' counsel as well as defendants have filed assignments of error which this court considers below:
Assignment of Error No. 1:
In their first assignment of error, defendants complain the trial court erred in failing to provide full discovery of statements made by co-defendants and co-conspirators. They specifically complain of the trial court's allowing co-defendants to invoke their Fifth Amendment privilege at a pretrial hearing and in denying full discovery of statements made by other conspirators to the prosecutor and to the grand jury.
On June 24, 1987, a hearing was held by the trial court for the State to establish a prima facie case of conspiracy. Brian D'Antoni testified for the State regarding the events leading to the murder of George Fleming. Defendants asked for an opportunity to rebut the State's case, and the hearing was recessed until June 30. Defendants subpoenaed Patricia Gore, Jason Lafrance, Zane Bryant and Steedie Ubas. All four witnesses invoked their privilege against self-incrimination upon the advice of their attorneys. Lafrance, Bryant and Ubas had pleaded guilty to conspiracy to commit murder pursuant to plea bargain agreements. No charges had been made as to Ms. Gore. The four had previously testified before the grand jury. At the hearing in question, they testified they knew the defendants and Christopher *491 Enos, but they refused to testify further. All four subsequently testified at trial.
Defendants claim the State urged the four witnesses to invoke their Fifth Amendment rights as part of the plea bargain and that none of them had a reasonable apprehension of further prosecution at the time of the hearing. There were no open charges against any of them, and Lafrance, Bryant and Ubas had already been sentenced.
In State v. Young, 448 So.2d 760, 763 (La.App. 2d Cir.1984), writ denied 450 So.2d 954 (La.1984), the Second Circuit stated:
The privilege against self incrimination must be liberally construed in favor of the party asserting it; to sustain the privilege it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim should be governed as much by his personal perception of the peculiarties of the case as by the facts actually in evidence. State v. Wilson, 394 So.2d 254 (La. 1981). See also In Re Parker, 357 So.2d 508 (La. 1978).
In State v. Coleman, 406 So.2d 563 (La. 1981), the defendant was charged, along with two others, with possession of P.C.P. with intent to distribute, and the defendant alone was charged with first degree murder. The two co-defendants pleaded guilty, and at the defendant's trial, they invoked the Fifth Amendment. In affirming the defendant's conviction, the Supreme Court held that the protection afforded by the privilege against self-incrimination was to be confined to instances where the witness had reasonable cause to apprehend danger from a direct answer. One of the co-defendants had already been sentenced but the other had yet to be sentenced. The two co-defendants still were in danger of potential exposure to further prosecution for crimes arising out of the events that led to the charges against them. The court further noted the defendant failed to show he was prejudiced by the witnesses' refusal to testify because there was nothing to indicate their testimony would have helped the defendant's case.
In the present case, the trial court did not err in allowing the witnesses to assert the Fifth Amendment at the pre-trial hearing requiring the State to establish a prima facie case of conspiracy. They all faced potential exposure to charges of first degree murder. Moreover, it is difficult to see how defendants were prejudiced by the refusal of these witnesses to testify at a pre-trial hearing. All of the witnesses testified at trial, and defendants have not shown how the testimony of these witnesses at the pre-trial hearing would have aided their cases.
Defendants also argue they were not allowed to discover statements made by these witnesses in the course of discussions in preparation of the case with the prosecutors. Defendants cite C.Cr.P. arts. 721 and 722 as support.
Article 721 provides (prior to its 1988 amendment which went into effect after the trial of this matter):
Upon motion of the defendant, the court shall order the district attorney to inform the defendant of the state's intent to use hearsay statements of coconspirators pursuant to R.S. 15:455.
Article 722 provides:
Upon motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy, photograph or otherwise reproduce any relevant written or recorded confessions or inculpatory statements made by a codefendant and intended for use at trial. Exculpatory evidence shall be produced under this article even though it is not intended for use at trial.
Defendants argue they are entitled to statements made by the witnesses during pre-trial discussions with the prosecutors under Article 722 because the witnesses were both co-conspirators and co-defendants. None of them were indicted for first degree murder and thus they cannot *492 be considered co-defendants whose statements would have been discoverable under Article 722.
This assignment of error is without merit.
Assignment of Error No. 2:
In their second assignment of error, defendants complain the trial court erred in refusing to order the State to produce the juvenile records and rap sheets of Patricia Gore, Steedie Ubas, Zane Bryant, Jason Lafrance and Brian D'Antoni. Defendants sought these documents in pretrial discovery, and the State responded that the documents were not discoverable. Defendants moved to compel production of the documents, and a hearing thereon was held May 18, 1987. The trial judge ruled that although the documents were discoverable, he lacked the authority to order the juvenile court to release them to defendants. The trial judge instructed defendants to go to juvenile court to get the pertinent records and rap sheets. Defendants assert they did not get the juvenile records because there was no procedural vehicle which would have allowed them to do so.
C.J.P. art. 123B provides:
For good cause, the court may order disclosure of records and reports of the court, probation officers, and law enforcement agencies to any person, agency; institution or other court upon a particular showing the the information is relevant to a specific investigation or proceeding.
Under this article, defendants could have obtained the pertinent juvenile records as was done in Thibodeaux v. Judge, Juvenile Division of 14th Judicial Dist., 377 So.2d 508 (La.App. 3d Cir. 1979). Since it appears from the record that defendants did not even attempt to obtain the documents from juvenile court, there is no basis for their claim of error.
This assignment of error is without merit.
Assignment of Error No. 3:
In this assignment of error, defendants complain the trial court erred in not granting the motion to sever filed by Carlene Fleming. They contend that their defenses were antagonistic. Cossich contends the severance should have been granted as to him because of evidence put on by Mrs. Fleming in her defense and because the State was able to use evidence which would have been inadmissible had he not been tried with Mrs. Fleming. Mrs. Fleming argues the severance should have been granted as to her because she was forced to sit next to the man accused of killing her husband which placed her in an anomalous position.
C.Cr.P. art. 704 provides:
Jointly indicted defendants shall be tried jointly unless:
(1) The state elects to try them separately, or
(2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
Article 704(2) includes situations where co-defendants have antagonistic defenses, but mere allegations of antagonism are insufficient to warrant a severance. State v. Rubbicco, 550 So.2d 219 (La.App. 4th Cir. 1989), writ denied 556 So.2d 1258 (La. 1990). A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that a co-defendant attempts to place the blame on the other with the result that each defendant has to defend against both his co-defendant and the State. State v. Prudholm, 446 So.2d 729 (La.1984). The defendant must show a joint trial will be prejudicial to his interests. State v. Deboue, 496 So.2d 394 (La.App. 4th Cir.1986), writ denied 501 So.2d 229 (La.1987). The granting or denial of a severance is within the discretion of the trial court which will not be overturned on appeal absent a showing that actual prejudice resulted from the denial. State v. Bradford, 367 So.2d 745 (La.1978). When a severance is sought before trial, the standard for obtaining a severance is broader because of the speculation as to what the trial evidence will actually be; and after trial commences, the standard is stricter because at that time the trial judge is able to analyze the evidence which has *493 actually been admitted. State v. Hodge, 457 So.2d 152 (La.App. 2d Cir.1984), writ denied 459 So.2d 545 (La.1984).
Mrs. Fleming originally moved for a severance prior to trial and Cossich joined in the motion. During trial, Cossich reasserted the motion for severance numerous times. It appears that the trial court did not err in denying the severance because there is scant support in the record for the contention that their defenses were mutually antagonistic.
Cossich basically asserted an alibi defense as provided by his sister Peggy Cossich. Mrs. Fleming's defense was that a trio of strangers showed up, first at her apartment and later at her parents' house, who offered to help her with her problem and to kill her husband. Mrs. Fleming identified two of trio as Steedie Ubas and Zane Bryant and that Cossich was not with them. Shirley Smollen, Mrs. Fleming's mother, could not be sure if Cossich were a member of the trio that was at her house the night before the murder. Both of them attacked the credibility of the State's witnesses, especially Patricia Gore and Christopher Enos.
Neither defendant had to defend against both the State and the other defendant. Cossich's defense did not inculpate Mrs. Fleming, and Mrs. Fleming's did not inculpate Cossich. If anything, Mrs. Fleming's defense was exculpatory vis-a-vis Cossich. The trial judge did not abuse his discretion in refusing to grant the severance.
This assignment of error is without merit.
Assignment of Error No. 4:
In their fourth assignment of error, defendants complain that the trial court erred in refusing to grant their motion for a mistrial when, during voir dire, the prosecutor told the jurors he could not compel the defendants to testify. Defendants claim they were prejudiced by the comment but do not specify how.
During voir dire, the following took place:
BY MR. IZZOLINO:
O.K. Fine. O.K. I've only gotand these are are very brief pointsI've only got one, two, three things. One of the things I have to tell you and the Defense will tell you is that the defendants are presumed innocent. As they stand here, they're presumed innocent, and it's up to the State to prove them guilty. Now, they are very unique. They're unique in this trial in that they are the only people who cannot be called to testify. I can't subpoena them and put them on the witness stand. They have a Fifth Amendment right not to.
BY MR. DOSKEY:
Your honor, excuse me, Mr. Izzolino, for a second. Your honor, I would object to that. If we care to go into it, I believe we can. But I do object to his going into that.
BY THE COURT:
No. overruled.
BY MR. DOSKEY:
Your honor
BY THE COURT:
No, overruled. As long as it'syou're arguing that it's not the law, sir?
BY MR. DOSKEY:
No, your honor.
BY THE COURT:
Then overruled.
BY MR. DOSKEY:
And I will make the objection and ask for the rulings under 770.
BY MR. OHLMEYER:
Same for my client, your honor.
BY THE COURT:
Fine.
BY MR. IZZOLINO:
The law is that the State cannot compel a defendant who is on trial to testify. Now, if he chooses or they choose to put them on the stand that's one thing. The only reason I'm saying is that if they do, can you treat them like any other witness and realize what their motivation is, and what they're facing today in determining whether or not they're telling the truth? Can you do that? All right. Because the judge is *494 going to tell you you can look at a witness' interest in a case, his bias, his stake in the outcome. What I'm, saying is will you not give them any extra credit if they do testify?
BY THE COURT:
The rule is that you have to treat them like any other witness, like a police officer, like anybody else. You remember what I told you before? You have to listen first. And after you listen, then you're going to apply your common sense to whether or not you think they were telling the truth. That goes for police officers, for defendants, for archbishops, for rabbis, for judges, whoever takes that stand. You swear to listen first and then apply your common sense and make a determination of whether or not they're telling the truth. All right.
This issue was recently dealt with in State v. Thomas, 553 So.2d 980 (La.App. 4th Cir.1989), writ denied 558 So.2d 568 (La.1990), in which the prosecution, during voir dire, referred to the defendant's right not to testify and asked the prospective jurors whether they would give his testimony more weight if he chose to waive his right. The prosecution also stated the defendant could be cross-examined should he choose to testify. This court found no error in the trial court's refusal to order a mistrial under C.Cr.P. art. 770(3) and stated:
It has been held that an indirect reference to the defendant's failure to take the stand is reversible only when the prosecutor intended to emphasize it. State v. Jackson, 454 So.2d 116 (La. 1984). It has also been held that during voir dire the State may mention the defendant's constitutional privilege against self-incrimination to the jurors, and then question them regarding the weight they will give to the defendant's testimony should he decide to testify. State v. Shea, 421 So.2d 200 (La.1982), reversed on other grounds, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985).
In the instant case, under Shea, supra, the State was entitled to inform the jury of the defendant's right to remain silent, and to question them as to the weight they would give the defendant's testimony. These were the first and third statements. The second statement, referring to the State's right to cross-examine the defendant should he decide to take the witness stand, appears to be merely a transitional statement prefacing the State's questioning of the jury regarding the weight it would give defendant's testimony. As such, the statement does not seem to be an intentional reference to the defendant's refusal to testify, particularly since, at this point in the proceedings, it was not even known whether defendant would testify or not. See, for example, State v. Willie, 410 So.2d 1019 (La.1982), cert. den., 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 723 (1984).
The State's comments do not appear to be an intentional and indirect reference to defendants' not testifying. The comments referred to the weight to be given their testimony should they decide to testify as permitted by Shea.
This assignment of error is without merit.
Assignment of Error No. 5:
In this assignment of error, defendants complain the trial court denied them the opportunity to impeach certain witnesses, namely Darjean Gore, Patricia Gore, Christopher Enos and Phil Jemison. As to Darjean Gore, defendants contend they were not allowed to cross-examine her as to her knowledge of the seriousness of the situation of her daughter Patricia which would have influenced her testimony and led her to corroborate Patricia's testimony. Regarding their cross-examination of Patricia herself, defendants complain they were not allowed to get before the jury Patricia's psychiatric record, her alcoholism and her participating in wet swimsuit contests in bars while still a minor. As to Enos, defendants argue they were not allowed to impeach Enos with all of his psychiatric records which would have revealed that Enos had an imaginary friend with whom he had conversations. As to Phil Jemison, *495 defendants claim they were not allowed to reveal his bias but do not go into specifics.
During cross-examination by defendants, Patricia Gore admitted to drinking and to going into bars when she was fifteen years old. The trial court sustained the State's objection to her being questioned about being in bars months after the shooting on the basis of irrelevancy. Nowhere was she asked about her participation in swimsuit contests in bars, although it was contemplated. The trial court stated it would not allow the introduction of photographs of Patricia unless there was a problem impeaching her. The trial court did not impermissibly restrict defendant's right to cross-examine Patricia. She admitted she went into bars and drank alcoholic beverages while still a minor. Since defendants never actually attempted to impeach Patricia on her participation in barroom swimsuit contests, there is nothing in the record to show that cross-examination was improperly restricted in this regard. Patricia also admitted to being hospitalized for psychiatric problems shortly after the murder and the record does not show that defendants attempted to impeach her with her psychiatric records.
As to Darjean Gore's cross-examination, she was asked if the attorney she hired for Patricia informed her of the possible consequences of Patricia's action, that is whether the attorney told her that Patricia could be executed. Mrs. Gore admitted knowing Patricia could have been imprisoned for life. The trial court sustained the State's objection on the basis of the attorney-client privilege. Mrs. Gore was also asked if she would lie to protect her daughter from the electric chair, and she replied that she would not. It should be noted that Patricia herself was aware she could possibly face execution. Defendants argue that Mrs. Gore should have been allowed to answer the question because it might have shown that this knowledge would have influenced her testimony and led her to corroborate Patricia's story. Even if the trial court erred in sustaining the State's objection, it appears the error was harmless since Mrs. Gore denied she would lie to protect her daughter from execution. Had she testified as to what Patricia's attorney told her about potential penalties, including execution, it seems doubtful she would have testified differently.
Defendants contend that as to Enos, they were not allowed to impeach him with his psychiatric records. They admit they were allowed to use some of the records, but argue they were not allowed to impeach Enos based on a notation in the records that Enos stated he had an imaginary friend. Enos admitted being admitted to F. Edward Hebert Hospital for drug and alcohol addiction in 1984 and that at the time he moved in with the Flemings his father was trying to put him in a drug addiction program. He was asked if he had an imaginary friend, and the State's objection to the question was sustained. Defendants argue they should have been able to question Enos about the imaginary friend and whether it was the imaginary friend or the Smollens who urged him to lie at the motion to suppress hearing and whether it was the imaginary friend and not Cossich he saw at the door the night before the murder.
The trial judge's ruling on the scope and extent of cross-examination should not be disturbed absent an abuse of discretion. State v. Coleman, 406 So.2d 563 (La.1981). It does not appear the trial court abused its discretion in this regard.
This assignment of error is without merit.
Cossich's Pro Se Assignment of Error No. 1:
Cossich complains in his first pro se assignment of error that the trial court failed to provide either full discovery or a full hearing on the obvious discrepancies in the search warrant and the supporting affidavit and on the credibility of the State's witnesses. He specifically complains about the search of his residence in St. Bernard Parish, in that the search and seizure of the alleged murder weapon was based on known misrepresentations and false information.
*496 Counsel for Cossich filed a motion to suppress the evidence, i.e. the .45 caliber gun seized from the sewing room at Cossich's residence. At the hearing on the motion to suppress held on May 18, 1987, counsel for Cossich stated:
"If Your Honor please, as to the warrant sworn to by Sergeant T. Buck in St. Bernard Parish, there's no contest. It's submitted."
Thus, it appears that any error regarding the validity of the search warrant was waived. Moreover, there appears to be no basis for Cossich's claims of misrepresentation and falsification in the affidavit supporting the search warrant. The affidavit was based on the statement given by Brian D'Antoni on the evening of November 20, 1986, shortly before the search warrant was issued. A reference to November 19, 1986 in the affidavit comes from D'Antoni's statement of November 20 that he was told by Cossich on November 19 where the gun was located. This assignment of error is without merit.
Cossich's Pro Se Assignment of Error No. 2:
In this assignment of error, defendant complains the trial court limited the cross-examination and impeachment of Phillip Jemison. Cossich argues the trial court should have allowed defense counsel to impeach Jemison with evidence of his arrest for child molestation which was based on accusations by Mrs. Fleming and her late husband. The trial court sustained the State's objection when defense counsel asked Jemison about the arrest. Cossich also claims defense counsel was not allowed to show that the witness on the bill of sale of the gun from Jemison to George Fleming did not exist; however, there is nothing in the trial transcript which shows that the trial court prevented defense counsel from doing so.
Under R.S. 15:495, evidence of conviction, but not of arrest, is admissible for the purpose of impeaching a witness' credibility.[1] Therefore, Jemison could not be impeached with evidence of his arrest.
This assignment of error is without merit.
Cossich's Pro Se Assignment of Error No. 3:
In his final assignment of error, Cossich complains the trial court erred in not directing a verdict of not guilty because of alleged inconsistencies in the search warrant and its accompanying affidavit and the inconsistencies in the testimony of the ballistics expert. He argues the trial judge should have stopped the trial when the inconsistencies became apparent.
As noted in State v. Brooks, 452 So.2d 149 (La.1984), a directed verdict is inappropriate in criminal cases; and its counterpart, a motion for acquittal, is not available in cases tried by a jury. C.Cr.P. art. 778 provides that a motion for acquittal is available only where the case is tried by the judge alone. Moreover, there is nothing in the record to show that such a motion was made.
This assignment of error is without merit.
Fleming's Pro Se Assignment of Error No. 1:
Fleming complains in her first assignment of error that there was prosecutorial misconduct.
The bulk of Fleming's argument regarding prosecution misconduct deals with an alleged pecuniary interest in the outcome of her trial by the assistant district attorneys who prosecuted her.
Fleming cites numerous other instances of prosecutorial misconduct, namely the use of perjured testimony; falsified arrest warrant; denial to defendants of access to witnesses; falsified affidavit for the search warrant for the gun; improper use of defendant's silence; fingerprints on and off gun; extra guns which were exculpatory; rehearsal of witnesses' testimony; and inflammatory language and description of her during testimony and closing argument. As to these alleged errors, Fleming refers only to pages in the trial transcript, and offers no argument on why these errors mandate a reversal of her conviction. *497 There is nothing which can be reviewed. Moreover, the issues of the search warrant and improper use of the defendant's silence have been discussed previously and found without merit. The only issue which Fleming does argue is that of the use of perjured testimony. We find no basis in the record that the State knowingly used perjured testimony.
This assignment of error is without merit.
Fleming's Pro Se Assignment of Error No. 2:
Fleming also complains of errors committed by the trial judge consisting of erroneous instructions and prejudicial comments to the jury; denial of the motion to sever; denial to her of help to improve her appearance; not forcing the State to respond to discovery; failure to enforce sequestration of the witnesses; denial of confrontation and impeachment of witnesses; and allowing the State to use hearsay. The issues of severance and discovery have been discussed previously and found without merit.
Fleming's claim of erroneous instructions to the jury is based on the trial judge's telling the jurors, on three separate occasions, they had to decide the case on the evidence they had heard in the courtroom "today" when the trial lasted six days. She argues this directed the jury to consider the closing arguments as evidence and telegraphed a predisposition to convict. She also contends the jury charge on reasonable doubt was a harsh test, and this combined with twice charging the jurors on the law of principals and a strong admonition to go back and reach a verdict showed a bias toward conviction. There is not merit to these arguments. The trial judge's use of the word "today" appears to have been inadvertent; and because there was no objection made, any error was not preserved. As to the jury charges themselves, they correctly state the law, and there is no basis upon which to conclude that the jury charges revealed a pro-conviction bias on the part of the trial judge.
Fleming complains that the trial judge denied to her any help in improving her appearance. On the second day of trial, she was not allowed to have her hairdresser do her hair and makeup. This is a frivolous claim since there is nothing to show that Mrs. Fleming was physically incapable of doing her own hair and makeup. This is far removed from the situation where a defendant is forced to go to trial attired in identifiable prison garb.
As to the other complaints, Fleming alleges the trial judge made unwarranted remarks demeaning her counsel but does not state what those remarks were or where they are to be found in the record. She also argues the trial judge failed to enforce sequestration of the witnesses; but from the argument she makes, appears to be complaining about events prior to trial and not during the trial itself.
Fleming further alleges as error something she calls "hearsay for the prosecution." She cites pages in the transcript but not particular testimony which is purportedly inadmissible hearsay. Since she fails to specify what was supposedly admitted into evidence in error, there is nothing to review.
This assignment of error is without merit.
Accordingly, for the reasons assigned above, the convictions and sentences of defendants Carlene Fleming and Robert Cossich are hereby affirmed.
AFFIRMED.
NOTES
[1] This matter was tried prior to the effective date of the new Code of Evidence.