| JAMES L. CANNELLA, Judge.
The Defendant, Anthony Crockett, appeals from his conviction of armed robbery and his sentence to 13 years imprisonment at hard labor without benefit of parole, probation or suspension of sentence. For the reasons which follow, we affirm and remand.
On December 5, 2002, the Jefferson Parish District Attorney filed a bill of information charging the Defendant with armed robbery in violation of La. R.S. 14:64. The Defendant was arraigned on December 6, 2002 and pled not guilty. On July 22 and 23, 2003, the case was tried before a twelve-person jury.

FACTS

Harmon Wright (Wright), the victim, testified that, on November 10, 2002, he got off work at 4:00 p.m. and went to the apartment of a friend, Donald Johnson (Johnson), where he had been residing. Wright had a paycheck for $550 in his pocket and $75 in cash from a catering event that he had worked the previous night. Johnson accompanied Wright as he cashed his check. Wright and Johnson lathen went shopping for groceries. They went back to Johnson’s apartment and Wright cooked dinner for a group including himself, Johnson, the Defendant, and another “guy.” They then watched a movie. When the movie ended, Johnson left the apartment with the “guy,” leaving the Defendant and Wright alone in the apartment. While the Defendant and Wright were watching television, a young lady *1141 came to the apartment, sat on the sofa next to the Defendant, and said to him, “Black, let’s go get something off the corner.” The Defendant and the lady then left.
A minute or two later, at approximately 11:00 or 11:30 p.m., the Defendant came back inside the house with a red shirt wrapped around his head. He produced a rust-colored .9 mm gun and told Wright to “give it up.” Wright gave the Defendant the cash that he had in his pocket, which was approximately $600. The Defendant told Wright to go into the kitchen and the Defendant then left the apartment. Wright put his belongings into his vehicle and went to the police station around the corner to report the robbery. He did not call the police because there was no telephone in the apartment.
Once Wright got to the police station, he told an officer that he had just been robbed by an individual named “Anthony.” Wright was eventually shown a photographic lineup and positively identified the Defendant as the robber, immediately and without hesitation. Wright also positively identified the Defendant in court. Wright testified that Johnson later threatened him if he did not drop the charges. Wright stated that he thought Johnson had set him up.
Jefferson Parish Sheriffs Office Deputy Thomas Bryson testified that Wright walked into the Second District at approximately midnight and advised the deputy that he had been robbed at gunpoint. Wright told him that he knew the individual, that his name was “Anthony,” and that he recognized the Defendant when the Defendant came back to rob him.
| ¿Jefferson Parish Sheriffs Office Lieutenant Norman Schultz testified that he was contacted by Deputy Bryson regarding an armed robbery, that he met with Wright that night, and that Wright told him who the individual was who robbed him and gave him his address. Lt. Schultz testified that he sent Deputy Randall to that address to see who was inside the apartment. Deputy Randall brought back Johnson who gave Lt. Schultz the Defendant’s name.
Based on that information, Lt. Schultz compiled . a photographic lineup and showed it to Wright, who positively identified the Defendant. Lt. Schultz testified that Wright immediately identified the Defendant, that there was no hesitation, and that he appeared to be sure of his decision. Lt. Schultz issued a warrant for the Defendant’s arrest and the Defendant was arrested a day or two later. Lt. Schultz read the Defendant his rights and the Defendant waived them. Lt. Schultz then took a statement from the Defendant.
In his first statement dated November 13, 2002, the Defendant said that the victim, Harmon Wright, who he knew as “Big Herb,” had been staying with him for a week. He explained that he knew Wright through his brother, Donald Johnson, and that Wright and his brother were friends.[1] The Defendant stated that he lived with his brother on Helen Street for approximately two weeks, and that he and Wright moved in at approximately the same time.
On November 10, 2002 the Defendant and Wright got drunk and had a disagreement at approximately 5:00 p.m. about Wright not buying food. At approximately 10:00 or 11:00 p.m., Kim, the Defendant’s female friend, came over to the apartment. The Defendant did not know her last name, but knew that she resided on King Frederick Court. The Defendant said that *1142 he left with Kim to go have sex, and then returned approximately thirty minutes later, not three to five minutes later as Wright claimed.
IsWhen the Defendant returned to the apartment, Wright was leaving in his vehicle. He knew something was wrong when Wright did not stop and talk to him. The Defendant denied going back into the apartment with Wright after he left with Kim. He returned to the apartment at approximately 4:00 or 5:00 a.m. and saw that Johnson had already gone to work.
The Defendant said that he saw Johnson after the robbery, and that Johnson told him that the police had come to see him about the Defendant, and that they had come to arrest the Defendant. The Defendant stated that he was wearing blue Gir-baud jeans with light blue stitching and two white T-shirts that night.
The Defendant denied robbing anybody when he came back to the apartment and he denied having or owning a gun. He stated that he did not know of anybody else who would have robbed Wright that night. He admitted that he had given the officer permission to search his living area for weapons. The Defendant said that somebody else could have come into the apartment while he was gone, because it is a high-crime area. He stated that when he left the apartment, there was a party outside at the end of Helen and Fredericks Streets, and that he saw a couple of men outside about his height wearing blue jeans and T-shirts.
Lt. Schultz testified that he removed two white T-shirts and a pair of blue jeans with light blue stitching from the apartment. He explained that the Defendant picked them up from a laundry basket and told him that those were the clothes he had worn that night.
Jefferson Parish Sheriffs Office Detective Kevin Decker testified that, on July 17, 2003, the State requested that he come to court because the Defendant had advised his attorney that he had additional information in reference to the investigation. He read the Defendant his rights, which the Defendant waived, and the Defendant gave a statement in the presence of his attorney.
pin this statement, dated July 17, 2003, the Defendant explained that, on the night of the robbery, he, Johnson, Wright, Slim (Johnson’s black male friend), and Kim, also known as Pickles (a black female friend), were sitting in Apartment A at 233 Helen Street in Gretna drinking and getting drunk. Eventually, everyone except him and Wright left the apartment.
All of a sudden, Kim came into the house and asked the Defendant to come show her something. The Defendant left with Kim, and they walked around the corner. Kim informed him that they were about to rob Wright, and the Defendant said in his statement that he told them that he did not want anything to do with it. He and Kim then went to a house on Nell Street, which was approximately three or four blocks away from where the Defendant was staying on Helen Street. The Defendant did not know whose house he was in.
As they went inside, they walked up the stairs and went into a room. The Defendant stated that Johnson, Kurt, and Slim were in there, and that they were talking about how they had just robbed somebody. The Defendant did not ask them who they had robbed, but he assumed it was Wright, since Kim had told him earlier that they had said they were going to rob him.
The Defendant said that Johnson, Kurt, and Slim were dividing the money. He stated that he thought he heard Kurt say that he only got $300. The Defendant said *1143 he was in the room for ten minutes. After Kurt divided the money, he asked the Defendant if he wanted $20, but the Defendant said that he did not take it. Kurt, who had a gun, said that if anyone said anything about this, that he would kill them.
Afterwards, the Defendant walked home alone, and Wright drove passed him. The Defendant tried to stop Wright and talk to him, but Wright just kept going. The Defendant said he did not change clothes when he was at the apartment |7on Nell Street. When Wright saw the Defendant, the Defendant was wearing the same clothes that he had on when he left the apartment on Helen Street.
The Defendant stated that Johnson was a twenty-four or twenty-five-year-old black male. He did not know Kurt’s last name, but stated that he was a twenty-two or twenty-three-year-old black male, approximately 5'9" or 5'10", about the Defendant’s build but approximately twenty pounds heavier, with a complexion a little lighter than the Defendant’s with no tattoos. The Defendant did not know Slim’s name, but stated that Slim was approximately thirty years old, a black male, with a light brown complexion and no noticeable tattoos.
The Defendant stated that Slim was wearing a black T-shirt, jean shorts, and sandals; that Johnson was wearing gray jogging pants with a white “A-liner” undershirt; and that Kurt was wearing a black pair of pants and a white “A-liner” shirt and that Kurt had a burgundy shirt sitting on the side of him. The Defendant said that he was wearing blue jeans with light blue stitches, a regular plain white cotton crew neck T-shirt, and black shoes. The Defendant stated that, when he saw the burgundy shirt on the bed, he also saw a silver and black semi-automatic handgun there.
The Defendant explained that Kurt carried a gun and that he knew Kurt from seeing him around the neighborhood. The Defendant said that he and Johnson were not related, but that he had known Johnson for twelve years, and that he loved him like a brother.
The Defendant explained that he did not come forward with this information before, because Johnson told him they did not have any evidence against the Defendant, and because Kurt had threatened to kill him if he said anything. Then the Defendant stated that he started thinking that he could go to trial and get a sixty to ninety-nine-year sentence when he did not receive any money. The Defendant | Ssaid he was willing to cooperate fully with the sheriffs office in the investigation, and that he was innocent of the crime and should have come forward earlier.
Detective Decker testified that he went to the area of Nell and Frederick Streets, but was unable to locate Kim, Slim, or Kurt. He explained that the Defendant was unable to give him those individuals’ last names, addresses, or telephone numbers. Detective Decker testified that Johnson gave him the first name of “Jamal” for Slim, but that he was never able to contact Slim. He further testified that Johnson was unable to assist him in his investigation to corroborate anything that the Defendant told him. He admitted that he had less than a week to work on this project.
Robert Johnson, who was called as a witness by the defense, testified that he was friends with the Defendant. He explained that, on November 10, 2002, he gave a birthday party for his daughter, that the party lasted from 2:00 to 8:00 p.m., that the Defendant was there the entire time, and that the Defendant was wearing blue Girbaud jeans with light stitching, a white T-shirt, and dark blue or *1144 black tennis shoes. He testified that he lived around the corner from the Defendant in the same neighborhood, and that it was a high-crime area. He stated that there were a lot of armed robberies in the area because it was a drug area.
Debra Gauthreaux, who was also called as a defense witness, testified that she was employed by the Jefferson Parish Sheriffs Office as commander of the central records division, and that they maintained all records including 911 calls. She identified a service report for the 200 block of Helen Street in Gretna and described some of the calls made to that area from September 1, 2002 to December 31, 2002. There were aggravated battery, armed robbery, residence burglary, theft, and miscellaneous complaints. She explained that 35 calls were made between those dates, and that eight resulted in a police report being made.
| (¡Following trial, the Defendant was found guilty as charged. The Defendant's motion for new trial was denied on December 1, 2003. On December 3, 2003, the trial court sentenced the Defendant to imprisonment at hard labor for 13 years without benefit of parole, probation, or suspension of sentence. The Defendant filed a motion for appeal on September 17, 2003, which was granted.[2]
On appeal the Defendant assigns two errors. In the Defendant’s second assignment of error, the Defendant argues that the evidence was insufficient to support the conviction. It is well settled that when issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine sufficiency of the evidence. When the entirety of the evidence, including inadmissible evidence, which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any issue regarding trial errors becomes moot. State v. George, 95-0110 (La.10/16/95), 661 So.2d 975, 978; State v. Conner, 02-363 (La.App. 5th Cir.11/13/02), 833 So.2d 396, 401, writ denied, 02-3064 (La.4/25/03), 842 So.2d 396. Therefore, we will address the Defendant’s second assignment of error first.

ASSIGNMENT OF ERROR NUMBER TWO

The Defendant argues that the evidence was insufficient to support the verdict because the State failed to prove identity. The State responds that the evidence was sufficient to prove the identity of the Defendant as the perpetrator of the armed robbery beyond a reasonable doubt.
In determining a challenge to the sufficiency of the evidence, the reviewing court must decide whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 82.
Here, the Defendant was convicted of armed robbery which is defined by La. R.S. 14:64 as “the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.”
Encompassed in proving the elements of an offense is the necessity of *1145 proving the identity of the defendant as the perpetrator. When the key issue in the case is identification, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Billard, 03-319 (La.App. 5th Cir.7/29/03), 852 So.2d 1069, 1072, writ denied, 03-2437 (La.2/6/04), 865 So.2d 739.
As to the element of identity, the State produced the testimony of Wright, the robbery victim, who positively identified the Defendant in a photographic line-up and at trial, without hesitation, asserting that he was positive. Wright explained that he knew the Defendant was the robber, because when the Defendant returned to the apartment, he was wearing the same clothes as when he left. Additionally, Wright recognized the voice instantly as the Defendant’s.
Wright further testified that he was familiar with the Defendant’s appearance: his weight, height, skin color, and haircut; that he was familiar with what the Defendant and Johnson looked like; that he had worked with Johnson in the past; that he had lived with the Defendant for approximately one week and saw him on a daily basis; that he shared a room one night with the Defendant while staying with Johnson; that the Defendant and Johnson did not look or sound similar to one another; that it could not have been Johnson who robbed him; and that he was certain that it was the Defendant.
lnThe Defendant argues that Wright’s testimony was not credible because of inconsistencies between his trial testimony and his statement to the officers on the night of the robbery. Defense cross-examined Wright regarding these alleged inconsistencies at trial. counsel
Wright testified at trial that the gun was rust-colored. He did not remember saying in his statement the night of the robbery that the gun was a silver-colored gun. He testified at trial , that the Defendant was wearing a white tank top T-shirt, blue fleece jogging pants, and brown shoes. He did not recall saying in his statement that the shoes were black. Also, after reviewing his statement at trial, Wright observed that the officer indicated that he had said that the Defendant’s pants were black.
Although there were some discrepancies between Wright’s trial testimony and his statement at the time of the offense regarding the Defendant’s clothing and the gun, the jury obviously concluded that these were minor compared to the testimony regarding Wright’s familiarity with the Defendant’s appearance and voice and his positive identification of the Defendant in the photographic lineup and at trial. Additionally, Lt. Schultz testified that the clothing he recovered from the Defendant, two white T-shirts and a pair of blue jeans with light stitching, was very similar to what Wright had described that the perpetrator was wearing.
Credibility determinations rest with the trier-of-fact and will not be reweighed on appeal. State v. Tapps, 02-0547 (La.App. 5th Cir.10/29/02), 832 So.2d 995, 1001, writ denied, 02-2921 (La.4/21/03), 841 So.2d 789.
Based on the foregoing, we find that the evidence was sufficient for the jury to find that the State met its burden of proving the essential elements of the crime, including the perpetrator’s identity, beyond a reasonable doubt. This assignment of error lacks merit.
I ^ASSIGNMENT OF ERROR NUMBER ONE
The Defendant argues that the trial court erred in failing to suppress the second statement he made which he contends was made during the course of plea negoti *1146 ations. He further contends that the erroneous admission of the statement cannot be found to be harmless error, because the jurors informed him post-verdict that it was this statement that caused them to convict him.
The State argues that the Defendant’s second statement was not part of a plea discussion and, therefore, it was properly admitted. Further, the State points out that, even if it had consented to plea negotiations, the Defendant provided no credible information that the sheriffs office could use. Thus, it is argued that there was no error in the admission of the statement.
On the morning originally scheduled for trial, defense counsel said that he was ready to pick a jury, but that the Defendant had informed him that he had information he would like to share with the district attorney’s office and the sheriffs office which could possibly lead to bringing the proper parties before the court.[3] The prosecutor stated that she wanted to put a couple of things on the record:
Number one, there are no deals on the table, nor will there — there ever be for the foreseeable future, so I don’t want this to be construed as a deal in progress. There are no deals, he is charged with armed robbery, he will be tried for armed robbery, as we stand right now.
She said that it was her understanding that the Defendant was waiving his rights and willing to give a statement and that Detective Decker was on his way to court to take a statement from him. She stated that she would like the court to question the Defendant regarding waiving his rights and giving a statement.
The trial judge continued the trial from July 17, 2003 to July 22, 2003. He advised the Defendant that on July 22, 2003 his trial was going forward absent the |13defense or the State saying they did not want to go forward that day. The trial judge stated:
Okay, that’s all I wanted — to understand, and the very last thing I want to understand is, from this moment on, there are no deals on the table, that, as far as I’m concerned, we do go to trial Tuesday morning. Understand that? The Defendant indicated that he under-
stood. Defense counsel said that the Defendant was previously offered eleven years but refused that, maintaining his innocence. Defense counsel further stated:
Any deals, obviously, all deals are off the table. I think he understands that. But he also refused any deals that were offered to him before that.
Defense counsel also stated:
And I’ve also given him a hundred warnings about what’s about to transpire, being truthful with the officers, and that we are going to trial on Tuesday, unless something breaks with the — ■ with the Sheriffs Office or something— else comes up.
Defense counsel added that he might not be present for every meeting, that he warned the Defendant of that, that the Defendant understood that, and that the Defendant was willing to talk to the police officers as many times as necessary.
The last page of the July 17 transcript indicates that a bench conference was later held. The court reporter noted that the bench conference was off the record and not fully recorded. During the portion *1147 that was recorded, the prosecutor told defense counsel she was not making the deal until she had some credible information. She said that she would do the best in her power to help. Defense counsel stated that it was all he needed to hear and that he knew she could not give him more than that. Later on July 17, 2003, the Defendant waived his rights and gave the second statement, as was detailed above.
On July 22, 2003, the State called this ease for trial. Defense counsel stated that he had filed a motion to suppress the second statement and that he was ready to go forward with it. The State said it would get the officer there.
|uOn July 23, 2003, in support of his motion, defense counsel argued that the State not be allowed to introduce into evidence the Defendant’s second statement because it violated the hearsay rules and because it was made as part of plea negotiations. The prosecutor noted that she had made it very clear on the record that whatever statement was given she intended to use at trial, that the Defendant had waived his rights, and that there was no deal under consideration. The State argued that a defendant’s statement, the statement of a party, that is going to be used against him at trial, is not hearsay. The State also argued that the statement did not have to-be an inculpatory statement or a confession, and that the statement was admissible under La. C.E. art. 801(D)(2)(a).
After hearing arguments of counsel, the trial judge ruled that the two statements could be used by the State. He found that the statement was not hearsay and that •there had been no deal made with the prosecutor prior to the Defendant giving his second statement.
The law regarding the admissibility of statements made during plea discussions is found in La. C.E. art. 410, which provides in pertinent part:
Except as otherwise provided in this Article, evidence of the following is not, in any civil or criminal proceeding, admissible against the party who made the plea or was a participant in the plea discussions:
[[Image here]]
(4) Any statement made in the course of plea discussions with an attorney for or other representative of the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn or set aside.
In State v. Lewis, 539 So.2d 1199 (La.1989), cited by both the Defendant and the State in their briefs, the Louisiana Supreme Court discussed the law regarding statements made during plea discussions:
The rules serve to promote negotiated disposition of criminal cases by giving the defendant protection from involuntary self-incrimination at two ends of the plea-bargaining spectrum: |1Bwhile he is negotiating over the disposition of his case and while he is offering or entering a plea that is rejected or later withdrawn ....
Id. at 1202 (citations omitted).
In determining whether defendant’s statement was given voluntarily, the “totality of the circumstances” inquiry requires the reviewing court to investigate and analyze “both the characteristics of the accused and the details of the interrogation.” ... Based upon a complete review of all relevant considerations on the issue of voluntariness, the ultimate question must be answered of whether the statement was “the product of an essentially free and unconstrained *1148 choice” or the result of an overborne will....
Id. at 1205 (citations omitted).
In the instant case, the record indicates that the Defendant’s second statement was not made in the course of plea discussions and, therefore, that the trial judge did not err in admitting it into evidence.
Defense counsel advised the prosecutor that the Defendant wanted to provide information that the sheriffs office could use to bring the party or parties who committed the crime to court. The prosecutor agreed to consider the information and to continue the trial for investigation of the claims that the Defendant made in his second statement. The prosecutor clearly stated on the record that no deals were on the table nor would there ever be for the foreseeable future, and that she did not want this to be construed as a deal in progress. Additionally, the trial judge stated that he understood that there were no deals on the table.
The prosecutor said that she would be willing to help if she had some additional credible information. However, she never got any credible information from the Defendant. The sheriffs office investigated the information provided by the Defendant, but was unable to corroborate it.
| u;Here, after reviewing the totality of the circumstances, we find that the second statement given by the Defendant was not made during the course of plea discussions and that the Defendant made the statement of his own free choice, although perhaps in the hope that it might lead to a plea discussion and ultimately a plea agreement. Thus, we find that the trial court did not err in denying the motion to suppress the second statement.
 Next, for the sake of discussion, we will consider that the statement was admitted in error. The erroneous admission of a confession or a statement is a trial error which is subject to harmless error analysis. State v. Koon, 96-1208 (La.5/20/97), 704 So.2d 756, cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997); State v. McCorkle, 97-966 (La.App. 5th Cir.2/25/98), 708 So.2d 1212, 1217 (citing Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).
An error is harmless if it does not affect substantial rights of an accused. La.C.Cr.P. art. 921. Such errors are harmless if a guilty verdict was surely unattributable to the error. State v.Code, 627 So.2d 1373, 1384 (La.1993), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994); State v. Winfrey, 97-427 (La.App. 5th Cir.10/28/97), 703 So.2d 63, 78, writ denied, 98-0264 (La.6/19/98), 719 So.2d 481 (citations omitted).
In the instant case, the State introduced strong evidence establishing the Defendant’s guilt. The evidence shows that Wright cashed his paycheck with Johnson present; that Johnson, the Defendant, Wright, and another man spent the evening together in Johnson’s apartment; that Johnson and the other man left the apartment; that the Defendant’s female friend came to the apartment shortly thereafter; that she and the Defendant left the apartment; that a minute or two later an individual identified by Wright as the Defendant came back into the apartment with a red shirt wrapped around his head and wearing the same clothes that the 117Pefendant had just left in and robbed the Defendant at gunpoint; and that Wright recognized the Defendant and his voice. Wright was unequivocal in his identification of the Defendant as the perpetrator. Also, clothing belonging to the Defendant matched the description of that worn by the robber.
*1149 Most importantly, the Defendant’s statement was not inculpatory. The Defendant did not admit in his statement that he committed the offense with which he was charged. The Defendant’s statement was essentially exculpatory, with the Defendant denying participation in the crime and implicating other people as the robbers.
The Defendant argues that the error was not harmless, because jurors allegedly told him post-verdict that they found the Defendant guilty based on his second statement. No evidence was admitted to support this assertion and we note that it would likely have been inadmissible. La. C.E. art. 606(B).
In light of the foregoing, we find that there was no error in the trial court ruling admitting the second statement at trial and, even if viewed as erroneously admitted, any error in the admission of the Defendant’s second statement was harmless. This assignment of error lacks merit.

ERROR PATENT DISCUSSION

The Defendant requests an error patent review. The record was reviewed for errors patent, according to La.C.Cr.P. art. 920: State v. Oliveavix, 312 So.2d 337 (La.1975); State v. Wetland, 556 So.2d 175 (La.App. 5th Cir.1990). Our review reveals that the Defendant was not advised of the two-year prescriptive period for filing an application for post-conviction relief, pursuant to La.C.Cr.P. art. 930.8. Therefore, the case must be remanded with instructions to the trial court to send appropriate written notice to the Defendant of the statement of the law regarding the prescriptive period for post conviction relief and to file written proof in the record that the Defendant received the notice. State v. Esteen, 01-879 (La.App. 5th Cir.5/15/02), 821 So.2d 60, 78, writ denied, 02-1540 (La.12/13/02), 831 So.2d 983.
Accordingly, for the reasons set out above, the Defendant’s conviction for armed robbery and his sentence to 13 years imprisonment at hard labor, without benefit of parole, probation or suspension of sentence, are affirmed. The case is remanded to the district court to provide proof in the record of the Defendant’s receipt of appropriate notice, under La. C.Cr.P. art. 930.8, of the prescriptive period for post conviction relief.
AFFIRMED AND REMANDED.

. The Defendant said in his second statement dated July 17, 2003 that he and Johnson were not brothers, but that he considered Johnson a brother and loved him like a brother.

. The appeal was premature when it was filed after conviction but before sentencing. However, this prematurity was cured by the subsequent sentencing. State v. Nichols, 03-1317 (La.App. 5th Cir.3/30/04), 871 So.2d 590.

. The July 17, 2003 transcript was attached as a joint exhibit by the State and the defense (State's Exhibit 1, Defense Exhibit 1) at the hearing on the motion for new trial on October 21, 2003.