892 So.2d 615 (2004)
STATE of Louisiana
v.
Courtney D. PACKNETT.
No. 04-KA-709.
Court of Appeal of Louisiana, Fifth Circuit.
December 28, 2004.
*617 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Thomas J. Butler, Frank A. Brindisi, Walter G. Amstutz, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Bruce G. Whittaker, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA and CLARENCE E. McMANUS.
SOL GOTHARD, Judge.
Defendant, Courtney D. Packnett, appeals his conviction and sentence on a charge of second degree murder, a violation of La. R.S. 14:30.1. For reasons that follow, we affirm.
Defendant was indicted by a Jefferson Parish grand jury for the second degree murder of Darren Tigler, and pled not guilty at arraignment. Before trial, defendant filed a motion for a sanity commission to determine his competency to stand trial. The parties stipulated to the commission's report, and the trial judge found defendant competent to stand trial.
Defendant proceeded to trial before a twelve-person jury, after which the jury unanimously found defendant guilty as charged. After denying defendant's motions for a new trial and for a post-verdict judgment of acquittal, the trial judge sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Immediately thereafter, the defendant orally moved for an appeal, and subsequently filed a written motion for appeal. The trial judge granted the motion for appeal; but denied a motion to reconsider the sentence.

FACTS
At approximately 10:47 p.m. on May 7, 2002, Deputy Kenneth Letort of the Jefferson Parish Sheriff's Office responded to a reported aggravated battery by shooting at a convenience store in the 3400 block of Ames Boulevard. Upon arrival, Deputy Letort found the victim, Darren Tigler, lying face down in the parking lot. Deputy Letort rolled the victim over and rendered CPR. According to Deputy Letort, the victim was breathing slightly and was making "gurgling" noises.
Malika Wells, O'Nekki Victor, and Andrew Harper witnessed the events leading up to the shooting that night. Harper was using the pay phone outside of the convenience store. Wells and Victor were parked parallel to each other in separate cars at the convenience store, and Tigler was between the two cars talking to Wells and Victor. At some point during their conversation, Thenita Gordon, the defendant's girlfriend, walked toward the store. As Gordon neared the store, Tigler said, "`You fine.'" When Gordon exited the store, a verbal altercation ensued between Gordon and the victim. Gordon said "`F  You'" to Tigler who replied, "`Don't disrespect *618 me like that.'" An exchange of words between Gordon and Tigler continued as he followed Gordon to her car, and even after she entered the car and sat in the passenger's seat. According to Wells, Tigler addressed the driver, later identified as defendant, saying, "Don't let her disrespect me like that."
During the verbal exchange, Tigler told Gordon that he would throw beer on her if she repeated the expletive, and Gordon did so. She also swung a metal object at Tigler, and Tigler threw the beer he was holding into the car. Tigler attempted to grab the metal object that had fallen to the ground, while Gordon and defendant exited the car. When Gordon attempted to grab the metal object, defendant pushed her to the side. While Tigler was leaning over to reach the object, defendant shot Tigler in the back. Tigler tried to walk away, but defendant continued firing shots. After the shooting, defendant and Gordon left in the car.
Tigler was shot five times, twice in his right arm, once in the right lateral side of his abdomen, once in the left mid-back, and once in the left sacral area. According to the coroner, the sacral wound was fatal, causing death within two to three minutes. The abdominal and mid-back wounds were potentially fatal, and the arm wounds were non-fatal. Tigler's blood alcohol level was .23.
Harper was at the scene when the police arrived. He told the police that he had seen the shooting, but could not identify the shooter. A few days later, the police went to the respective residences of Wells and Victor. Both women identified Thenita Gordon from a photographic lineup, but neither was able to identify the shooter.
During the investigation, the police learned that defendant was Gordon's boyfriend at the time of the shooting. Warrants to search Gordon's residence and for her arrest were obtained, and were executed on May 13, 2002. Both defendant and Gordon were at the residence when the warrant was executed. Gordon was arrested, and defendant was taken into custody. Thereafter, defendant waived his rights and gave a recorded statement to Detective Thornton. Defendant acknowledged that Gordon and Tigler were having words, but denied that he shot Tigler. According to defendant, Tigler was drunk, threw beer, which splattered inside the car, and called Gordon a "wh-e." Defendant claimed he tried to encourage Gordon to leave, but she grabbed a silver pool stick case from the back seat. Defendant said Tigler pulled the silver case through the passenger's side window and dropped it to the ground. Gordon then climbed out of the passenger's side window and picked up the case. Defendant noticed a black male in the parking lot, whom he first believed was a friend of Tigler's, but the man shot Tigler as he started to run. Defendant speculated that the shooting was a "hit" resulting from a fight Tigler had a few weeks before. Defendant said that he and Gordon left the scene because they both had outstanding warrants. Defendant also said that the pool stick and case were at Gordon's residence.
Defendant was subsequently arrested. The police never found the murder weapon. Additionally, Detective Klein, the case officer, testified that the police did not recover any guns from Gordon's residence or car. A silver-colored pool stick carrying case was seized from Gordon's residence, and it was admitted into evidence. Wells said that the object Gordon had was thinner, but was about the same length as, the object admitted at trial.
In April of 2003, approximately one year later, Harper came forward and told the police that he could identify the shooter. When shown a photographic lineup, Harper *619 identified defendant as the gunman. At trial, he explained his grandmother had encouraged him to reveal the shooter to the police after the police had contacted her. Harper said that he had initially lied to the police because he was afraid to identify the shooter. At trial, Harper identified defendant as the shooter.
The defense called Thenita Gordon as a witness, but she invoked her privilege against self-incrimination.

LAW
In brief to this Court, defendant assigns four errors, the third of which is insufficiency of evidence to support the conviction. It is well established that, when the sufficiency of the evidence used to support the conviction is questioned, it must be considered first. When the entirety of the evidence, including inadmissible evidence, which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any issue regarding trial errors becomes moot. State v. Crockett, 04-201, p. 5 (La.App. 5 Cir. 10/12/04), 886 So.2d 1139.
In this assignment of error, defendant contends the evidence presented is, at best, a showing that defendant committed manslaughter. The evidence is insufficient to support his conviction for second degree murder.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
To prove second degree murder, the State must show (1) the killing of a human being, and (2) that the defendant had the specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent may be inferred from the circumstances and actions of the accused as well as from the extent and severity of the victim's injuries. State v. Keating, 00-51 (La.App. 5 Cir. 10/19/00), 772 So.2d 740, 743, writ denied, 00-3150 (La.10/12/01), 799 So.2d 494.
Defendant argues that the State proved, at most, that he was guilty of manslaughter, a lesser included offense to second degree murder. The manslaughter statute, La. R.S. 14:31, provides, in pertinent part:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]
"Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense. State v. Johnson, 01-1362 (La.App. 5 Cir. 5/29/02), 820 So.2d 604, 610, writ denied, 02-2200 (La.3/14/03), 839 So.2d 32, citing State v. Lombard, 486 So.2d 106, 110 (La.1986). A defendant *620 who establishes, by a preponderance of the evidence, that he acted in a "sudden passion" or "heat of blood" is entitled to a manslaughter verdict. State v. Johnson, supra. The question for this Court on review, is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. State v. Lombard, supra.
In the present case, the evidence showed that defendant exited the car and fired five shots into the body of an intoxicated, unarmed man. The first shot was to the victim's back, followed by four more shots, even as the victim tried to flee. Although defendant contends he established the mitigatory factors of manslaughter, there is no evidence that defendant acted in sudden passion or heat of blood. Rather, defendant's actions reflect he acted with deliberation and control. Although the evidence reflects that Gordon was cursing the victim, there is no evidence that defendant raised his voice, or lost his temper, or that defendant even addressed the victim before firing five shots into his body. Further, Victor saw defendant squinting, as if taking aim, before firing the gun. Although Tigler's behavior could be considered annoying, the jury obviously concluded that Tigler's actions did not rise to the level of provocation sufficient to deprive the average person of his self-control and cool reflection and to lead him to commit murder. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. State v. Deal, 00-434 (La.11/28/01), 802 So.2d 1254, 1260, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002). It is the role of the fact-finder to weigh the respective credibilities of the witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983). Accord, State v. Wallace, 00-1745 (La.App. 5 Cir. 5/16/01), 788 So.2d 578, 584, writ denied, 01-1849 (La.5/24/02), 816 So.2d 297. Viewing the evidence in this case in the light most favorable to the prosecution, the jury could have reasonably found that the mitigatory factors were not established by a preponderance of the evidence. We find no merit in this assignment of error. Accordingly, we now address defendant's other assignments of trial errors.
In his first assignment, defendant contends that the trial court erred by denying his request for a mistrial on the ground that the prosecutor commented, during voir dire, on the defendant's anticipated exercise of his right not to testify at trial. The State first responds that defendant is precluded from urging this assignment because the entire voir dire is not in the record. The State further argues that the excerpt of the voir dire referred to by defendant is not part of the record.
However, the excerpt of the voir dire containing the prosecutor's remark was submitted to the court as a defense exhibit, and was quoted from during the hearing on the motion for new trial. In any event, before this case was docketed, this Court requested supplementation of the record with the entire voir dire in order to properly address the claim made in this assignment. The record was supplemented with the voir dire on September 29, 2004. Therefore, the issue is properly before this Court.
In the alternative, the State responds that the trial judge properly denied the mistrial motion because the prosecutor's remarks explained the law on the defendant's *621 Fifth Amendment right to remain silent and did not refer to defendant's potential failure to take the stand.
The comments at issue occurred immediately after the prosecutor's explanation of the presumption of innocence and during the prosecutor's discussion of the defendant's right not to testify:
MR. BRINDISI [prosecutor]:
And in addition to that there is another right that the
Defendant has. And that is the Defendant in every criminal case, every criminal charge  the Defendant always has the Fifth Amendment Right not to testify. He does not have to testify.
I can Subpoena almost anyone, anyone in the State of Louisiana or outside the State of Louisiana through the use of a Subpoena. Y'all got Subpoenas to be here; right. Everybody got a Subpoena. You showed up; right. If you get a Subpoena and you don't show up, they'll issue an Arrest Warrant. They'll go out and get you. That shows you how powerful of a vehicle a Subpoena is. It can bring people into Court. So I can send a Subpoena to the Governor of Louisiana. I can send a Subpoena to most every Governor, to the Mayor of New Orleans, to most people living outside the State of Louisiana if I can show the Judge that their testimony will be helpful to the Jury. Just can't send Subpoenas out to everybody.
There is one person in the whole State, in the whole Country, in the whole World that I can't send a Subpoena to; and you know who that is. Y'all know who that is?
JUROR:
The Judge.
MR. BRINDISI:
Who?
JUROR:
The Judge.
MR. BRINDISI:
No. The Defendant. I can't make the Defendant testify. He has the right not to testify, and I have nothing to say about it. I have nothing to say about it. That's up to his Attorney and that's up to him. Ultimately it's his decision whether or not he's going to testify.
And the reason why I'm telling you is this. That is his decision to testify or not. But the point is this-I just want to mention this. You can't hold that against him. You can't hold it against him. You cannot hold it against him. And I know that's a very serious order to ask or request to ask of you. Because I know as human beings we're all such curious people. We're all such curious people. I mean, the one person you think you might want to hear from, you're not allowed to. So I think that plays at least some kind of uncomfortability
At this point, defendant objected and moved for a mistrial, and the following discussion took place out of the hearing of the jury:
MR. PEREZ [defense counsel]:
Your Honor, I think the State clearly crossed the line. Objection. And I'm moving for a Mistrial. I think that they clearly crossed the line in Article 770, a judicial [sic] comment. He is not to make any reference whatsoever of the Defendant's failure to testify.
Now granted it's premature. If it was just his failure to testify. But when the District Attorney tells this Jury that the one person you would *622 want to hear from is him  Now I think we've got a 770 problem.
MR. BRINDISI:
I don't see the problem with that Judge. I'm just telling them that they're not allowed to hold that against him whether or not he does.
MR. PEREZ:
770 says he cannot make direct nor indirect. I can't think of anything anymore direct.
THE COURT:
Mr. Brindisi, it's going on an hour. This [is] at most a monologue, okay. And you've done a better job than I when reading my instructions. I think you must have them committed to memory. It's gotten to be a bit tedious.
MR. BRINDISI:
I'm almost finished Judge.
THE COURT:
You will not comment on whether or not they might want to hear from him or not. You will say they cannot.
After the trial judge denied the mistrial motion, the prosecutor reiterated to the prospective jurors that they were not allowed to hold the defendant's failure to testify against him. The prosecutor then questioned some of the prospective jurors if they were "okay with that," and they responded affirmatively.
La.C.Cr.P. art. 770(3) provides that a mistrial shall be ordered when the prosecutor makes a remark or comment during the trial or in argument, within the hearing of the jury, that refers directly or indirectly to the failure of the defendant to testify in his own defense.[1] The purpose behind Article 770(3)'s prohibition against prosecutorial comment is to protect the defendant's Fifth Amendment right against self-incrimination by preventing attention being drawn directly or indirectly to the fact that the defendant has not testified on his own behalf. State v. Mitchell, 00-1399 (La.2/21/01), 779 So.2d 698, 701.
When the prosecutor directly refers to the defendant's failure to take the stand, the defendant must be granted a mistrial if he requests one. State v. Mitchell, supra, citing State v. Fullilove, 389 So.2d 1282, 1284 (La.1980). State v. Jackson, 454 So.2d 116 (La.1984). An indirect reference to the defendant's failure to take the stand warrants a mistrial only when it is clear that the remark was intended to focus the jury's attention on the defendant's not testifying. State v. Mitchell, supra.
During voir dire, the State may mention the defendant's constitutional privilege against self-incrimination to the jurors, and then inquire into the weight jurors will give to the defendant's testimony if he decides to testify. State v. Shea, 421 So.2d 200 (La.1982), rev'd on other grounds, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985). In Shea, the prosecutor stated that the defendant does not have to "do anything in his defense" but that he had the right to take the stand. The prosecutor then asked a prospective juror whether she would be able to judge his credibility like any other witness. The Louisiana Supreme Court held that the trial judge did not err in refusing to grant a mistrial because the remark was not a comment on the defendant's failure to take the stand. Rather, the Shea court concluded that the prosecutor merely mentioned *623 the defendant's constitutional privilege not to testify and directed a legitimate inquiry into the weight jurors would accord his testimony if he did so. Id. at 206.
Likewise, the Fourth Circuit found no error in the trial court's denial of a mistrial motion made after the prosecutor referred to the State's inability to compel a defendant to testify in State v. Fleming, 574 So.2d 486 (La.App. 4 Cir.1991), writ denied, 592 So.2d 1313 (La.1992). As in the instant case, the prosecutor in Fleming told prospective jurors that the State could not subpoena a defendant as follows:
One of the things I have to tell you and the Defense will tell you is that the defendants are presumed innocent. As they stand here, they're presumed innocent, and it's up to the State to prove them guilty. Now, they are very unique. They're unique in this trial in that they are the only people who cannot be called to testify. I can't subpoena them and put them on the witness stand. They have a Fifth Amendment right not to.
Id. at 493.
The Fleming court concluded that the prosecutor's comments did not appear to be an intentional and indirect reference to the defendants' not testifying. Rather, the court found that the comments were permissible under Shea because they referred to the weight to be given the testimony, if the defendants were to testify. Id. at 494.
Similarly, the court in State v. Thomas, 553 So.2d 980 (La.App. 4 Cir.1989), writ denied, 558 So.2d 568 (La.1990), found no error in the trial court's refusal to grant a mistrial based on a prosecutor's voir dire comments where the prosecutor remarked as follows:
He [the defendant] has the right not to take the stand. And I have a philosophical question I always ask the jurors. The bottom line, people have told me that after the State presents their case, after the police officers tell what they remember happening that day, they feel that they should hear the defendant's side of the story. Again, this is something that 
Id. at 983.
Under State v. Shea, the court found that the comment was an appropriate explanation of the defendant's right to remain silent and inquiry into the weight the jury would give to the testimony. State v. Thomas, 553 So.2d at 983-984.
The instant case is similar to Fleming in that the prosecutor referred to the State's inability to subpoena the defendant. It is similar to Thomas in that the prosecutor mentioned that the jurors might desire to hear from the defendant. Standing alone, the prosecutor's remark immediately preceding defendant's objection seems to tread very close to an impermissible reference.[2] Taken in context, however, it appears that the prosecutor's comments were permissible under Shea because the comments were made in the context of the prosecutor's explanation of the burden of proof and the defendant's privilege against self-incrimination. The prosecutor's point was to emphasize that the defendant had the right not to testify and that the jurors could not hold it against the defendant if he chose to exercise that right. The remarks were a comment on the defendant's failure to take the stand, but were a permissible discussion of the privilege against self-incrimination followed by an inquiry into the prospective jurors' ability to accept *624 the law. This assignment is without merit.
In the second assignment of error, defendant argues the trial court should have excused a juror who formed the opinion that appellant was guilty after only having heard the testimony of the Coroner, Officer Letort, and Andrew Harper.
Defendant contends that the trial judge should have replaced Juror Wollforth, who told the bailiff, "`We can wrap this up early, you know, I've pretty much seen enough.'" According to defendant, the juror's comment indicated that he was not impartial and had formed the opinion that defendant was guilty.[3] The State responds that the trial judge did not abuse his discretion in refusing to replace the juror.
Juror Wollforth's statement was made during a lunch recess on the second day of trial. After lunch, the bailiff reported the remark to the trial judge, who questioned Juror Wollforth in chambers in the presence of the defense attorney and the prosecutors. Thereafter, outside of the presence of the jury, the trial judge stated for the record that Juror Wollforth admitted making the statement and denied that he had any discussions with his fellow jurors about the statement. The trial judge further related that he was persuaded Juror Wollforth would follow the law, would keep an open mind and would listen to the entire case. The trial judge stated that he was placing the substance of the in-chambers discussion on the record at the request of the defendant and the State and in the abundance of caution.
Nevertheless, defendant urged the trial judge to replace Juror Wollforth with an alternate juror. The defense attorney remarked that he felt that Juror Wollforth was "probably leaning in favor of the Defense," but argued the juror should be removed because his remark reflected he was predisposed to a decision. The defendant also requested that the trial judge examine all of the jurors to rule out the possibility of "contamination," and moved alternatively for a mistrial. The trial judge subsequently questioned Juror Wollforth under oath as follows:
THE COURT:
Mr. Wollforth, did you speak with me in my chambers moments ago in the presence of the Defense Attorney and the Prosecutors?
THE WITNESS:
Yes.
....
THE COURT:
Did you not at that time answer my questions regarding whether or not you had made a remark about you didn't need to hear anymore witnesses?
THE WITNESS:
Yes, I did say that.
THE COURT:
Okay. So that the record is clear; would you repeat for us now what was your statement? If you can remember.
THE WITNESS:
I said to Ms. Burmaster [the bailiff], I said "We can wrap this up early, you know, I've pretty much seen enough."
THE COURT:
Okay. Did you not use the term "we"?

*625 THE WITNESS:
Yes, I think I did. I believe I did.
THE COURT:
Okay. Were you referring to you and other members of the Jury?
THE WITNESS:
When I said it I wasn't thinking of the other members of the Jury; because we have not spoken to the other members of the Jury. So it's no including them in that statement because I didn't say that to them. We didn't talk about that. I happen [sic] to say that to Ms. Burmaster. That was it.
THE COURT:
Okay. So she and you are the two that make up the "we".
THE WITNESS:
Yes.
THE COURT:
Okay. Let me ask you specifically. Did you utter that remark to anybody else on the Jury that you uttered to her?
THE WITNESS:
No.
THE COURT:
Okay. To your knowledge, was anyone around you when you uttered that remark, that might have overheard your remark?
THE WITNESS:
I don't think so, because they were far behind us in the line going to lunch, and I was right next to her.
THE COURT:
And you didn't use  Did you use your normal conversational tone or were you speaking lower than that or higher than that?
THE WITNESS:
Actually lower than that.
THE COURT:
Lower than that, okay. Did I ask you if you had formulated an opinion at this particular point in time 
THE WITNESS:
No.
THE COURT:
 As to the guilt or innocense [sic] of the Defendant?
THE WITNESS:
No.
THE COURT:
Have you?
THE WITNESS:
No.
THE COURT:
Alright. I reminded you of my instruction to you and your fellow jurors for keeping an open mind. Do you remember that?
THE WITNESS:
Yes.
THE COURT:
Okay. That is still my instruction. Are you able to follow that instruction?
THE WITNESS:
Yes.
THE COURT:
Alright. Is it your intention to follow it by listening to all of the evidence and then commence deliberation and then and only then come to an opinion regarding guilt or innocence?
THE WITNESS:
Yes.
THE COURT:
Alright. And there has been no discussion amongst your fellow jurors of which you may or may not have been a participant, but which you've overheard *626 as to any of the facts in this case; is that correct?
THE WITNESS:
They're actually talking about a cruise ship.
....
THE COURT:
Alright. Are there any other subjects that you would like me to broach with this 
MR. BRINDISI [prosecutor]:
No Your Honor, that's fine.
MR. PEREZ [defense attorney]:
No Your Honor....
The trial judge then denied the motions to replace Juror Wollforth and for a mistrial, reasoning that Juror Wollforth did not violate his oath as a juror and that Juror Wollforth had an open mind.
After the first witness is sworn, La.C.Cr.P. art. 789 provides for the replacement of a juror with an alternate juror in the event a juror becomes unable to serve or is disqualified. State v. Pendelton, 00-1211 (La.App. 5 Cir. 3/14/01), 783 So.2d 459, 462, writ denied, 01-1242 (La.1/25/02), 807 So.2d 243. A trial judge may disqualify a juror upon a finding of blatant prejudices and partiality. State v. Sepcich, 473 So.2d 380, 385 (La.App. 5 Cir.1985), citing State v. Fuller, 454 So.2d 119 (La.1984) and State v. Marshall, 410 So.2d 1116 (La.1982).
In the present case, the judge acted properly in holding an evidentiary hearing, with all parties present, to determine the existence of a violation of the judge's order, the nature and extent of the violation, and the appropriate solution to the problem. See, State v. Fuller, 454 So.2d at 123. Juror Wollforth's answers to the trial judge's questions indicated that he could be a fair and impartial juror, and that he had not shared his remark with other jurors. If Juror Wollforth had given the trial judge some indication that he could not be impartial, perhaps the trial judge would have replaced him, as was the case in State v. Sepcich, supra, where a juror told the trial judge during trial that she could not be impartial because she knew some of the State's witnesses. We find the trial judge did not abuse his discretion in refusing to replace Juror Wollforth with an alternate juror.
In his final assignment of error, defendant requests a review of the record for errors patent. We have conducted the review and find that, while the transcript reflects that the trial judge imposed the sentences without benefit of probation, parole and suspension of sentence, the commitment does not. When there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983). Under La. R.S. 15:301.1(A) and the rationale in State v. Williams, 00-1725 (La.11/28/01), 800 So.2d 790, the required statutory restrictions are contained in the sentence, and no correction of the commitment is necessary.
For the foregoing reasons, we affirm defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] According to La.C.Cr.P. art. 761, trial had commenced. That article provides in pertinent part that "[a] jury trial commences when the first prospective juror is called for examination."
[2] See, State v. Willie, 410 So.2d 1019, 1026 (La.1982), in which the Louisiana Supreme Court noted that the trial judge's remarks to the jury during voir dire were not a direct or indirect reference to defendant's failure to testify, but came "dangerously close."
[3] On appeal, defendant does not contest the denial of his mistrial motion, but only the denial of his motion to replace the juror.